JACKSON, *ex dem.* Erwin and others, *against* MOORE.

In the description of parcels in a conveyance of land by boundaries, or number of the lot, or other certain designation, the quantity being mentioned in addition, without an express covenant that the land contains that quantity, the whole is considered as mere description; and quantity being the least certain part, must yield to boundaries, or the number of the lot, or other more certain description.

Effect should be given to every part of the description, if practicable. But if the thing to be granted, appear clearly from any part of the description; and other circumstances are mentioned, not applicable, the grant will not be defeated; but the false or mistaken part will be rejected.

What is most material and most certain, shall prevail over that which is less material and less certain. Thus, course and distance shall yield to natural and ascertained objects, as a river, a stream, a spring, or a marked tree.

Thus, where a conveyance was, of " two tracts or parcels of land, lying, &c., being township no. 3, &c., also township no. 4, &c., *to be* 6 miles square; and containing 23040 acres each, and *no more,*" &c., though these tracts were in fact 6 by 8 miles in size; *held,* that the whole 6 by 8 miles passed.

Such a description is not ambiguous in a legal sense, so as to be a subject of elucidation from extrinsic evidence.

The acts of a portion of the grantees, tenants in common, in locating land under a deed, will not affect the co-tenants, unless it appear that they sanctioned these acts in some way.

And the court will not, in such a case, presume a grant, for the purpose of quieting ancient possessions.

A grant of land will never be presumed from lapse of time, unless it be so great as to create the belief that it was actually made; or unless the facts and circumstances in the case, show that the party to whom it is presumed to have been made, was legally, or equitably entitled to it.

A trust in lands, (except a resulting trust,) must be manifested in writing; but it may be declared either before or after the conveyance to the trustee.

To make out a resulting trust, by the payment of the consideration money by one, the deed being taken in the name of another, the money must be paid at, or before the execution of the deed.

One may, by the same conveyance, take an undivided portion of land to himself in his own right; and be a trustee for other portions in the same land; and afterwards he may buy in, and take a conveyance to himself from any or all of his *cestuis que trust;* in which case he ceases to be a trustee, and becomes the absolute owner of the share or shares so purchased in by him.

Note (*a*) to this case, contains the English doctrine of parcels.

EJECTMENT; tried at the *Steuben* circuit, *January* 13th, 1824, before THROOP, C. Judge; when the following facts appeared:

The lessors of the plaintiff claimed as the children and grand children, and heirs at law, of *Arthur Erwin,* who died in *June,* 1791, intestate, leaving ten children, five of whom are lessors. The seven remaining lessors are the children of his daughter, *Sarah Mulhollon*; she left eight

ALBANY,
Feb. 1827.

Jackson
v.
Moore.

children, one of whom is not a lessor. The extent of the plaintiff's claim was five tenths and seven eighths of another tenth of the interest of their ancestor in the premises in question. But it was conceded that the right of all the lessors, except the children of *Sarah Mulhollon*, were barred by the statute of limitations; so that the recovery of the plaintiff, if he should be entitled to recover at all, could only be for seven eighths of one tenth of the interest of which *Arthur Erwin* died seized, in the premises in question. The premises were designated as *lot no.* 4, in the *Gore, east* of *township* 3, 5th range, (as surveyed by *Augustus Porter*,) in the town of *Canisteo*, in the county of *Steuben*, containing 162 acres. It was admitted, at the trial, that the defendant was in possession of that lot when the action was, commenced. When that was, did not appear in the case, but the demise was laid on the 2*d* day of *May*, 1816.

Both parties derived their title from *Oliver Phelps*. The conveyance, under which the plaintiff claimed, bore date the 17*th* of *September*, 1790, and was from *Oliver Phelps* to *Arthur Erwin, Solomon Bennet, Joel Thomas,* and *Uriah Stephens*. It purported to convey to them, their heirs and assigns, " two tracts, or parcels of land, ly- " ing and being in the district of *Erwin*, county of *Ontario*, " and state of *New-York*, being township number *three in* " *the* 5*th range* ; also number *four in the* 6*th range* ; *to be* " six miles square, and containing twenty-three thousand " and forty acres each, and *no more* ; and known by the " name of the old *Canisteo* castle." The consideration expressed in the deed, was £2666 13*s.* 4*d.* This conveyance was confirmed by *Nathaniel Gorham*, (who was a joint proprietor with *Phelps*, of the large tract, called *Phelps* and *Gorham's* purchase, of which these townships were a part,) by his deed of the 1*st* of *February*, 1792.

This tract was surveyed and run into townships by *Augustus Porter* and *Frederick Saxton*, for *Phelps* and *Gorham*, in 1789. The corners of the townships were marked, though the lines were not run so as to test the contents with accuracy.

The original agreement for the *Erwin* purchase, was made on the 18*th* day of *August*, 1789, between *Oliver Phelps* of the one part, and *Solomon Bennet* and *Elisha Brown* of the other. It was before the tract was run into townships by *Porter;* and the numbers of the towns were not specified. *It was for two townships, each town to be six miles north and south, and five miles and a half east and west,* lying in the county of *Ontario, &c. ; to be located in such a manner as to take in part, or all of the old Canisteo flat ; and not to derange the adjacent towns.*

The history of this purchase appeared from the testimony of *Uriah Stephens,* junr. to be this : In the early part of 1789, a number of persons came into the western part of this state, to buy land. In order to purchase cheaper, and on better terms, they formed a company, consisting of 12 persons, and *Solomon Bennet* and *Elisha Brown,* two of the associates, were selected to go to *Oliver Phelps,* and make a purchase for the company. In pursuance of such authority, they went, and entered into the contract of *August* 18*th*, 1789. The purchase was approved of by the company ; and soon after, *Arthur Erwin, Solomon Bennet* and *Joel Thomas,* were deputed by the company to go to *Canandaigua,* where *Phelps* resided, to complete the purchase. They accordingly went, and took a deed for township 3, *5th range,* and township 3, *6th range. Uriah Stephens* was made a party to the deed by the request of *Phelps,* and afterwards signed the notes which were given for the consideration money. It was soon discovered that the *Canisteo Flats,* which the company wished to purchase, were not covered by these lots ; but were covered by township 3, 5th range, and township 4, 6th range. *Erwin, Bennet, Thomas* and *Stephens* accordingly went to *Canandaigua,* in *September,* 1790, to get a deed for those townships, and to deliver up the former one. *Phelps* agreed to give them a new deed, provided they would consent to strike 1-2 mile by 6 from each township, so as to make them 5 1-2 by 6 miles. As considerable improvements had been made on township 3, 5th range, it was agreed that, instead of taking 1-2 mile from that

ALBANY,
Feb. 1827.

Jackson
v.
Moore.

township, one mile in width, should be taken, from township 4, 6th range ; so as to leave township 3 six miles square, and township 4, five miles by six.   In pursuance of this arrangement, the deed of *September 17th*, 1790, was executed by *Phelps* to *Erwin, Bennet, Thomas* and *Stephens*, for the two entire townships ; and they, on the same day, reconveyed to him one mile by six off the west side of township 4, 6th range.

Before these representatives of the company went to *Canandaigua* to consummate the previous contract, and soon after that contract was made, *to wit, on the* 18*th day of October*, 1789, they entered into a covenant with their eight associates, that they should have $\frac{8}{12}$ of the two townships purchased of *Phelps*.   The eight associates covenanted to pay to them $\frac{8}{12}$ of the consideration paid for the land, and also the same proportion of the costs and expense of procuring it ; to be paid in 3 equal instalments, on the 1*st* of *May*, 1790, 1 and 2.   The four covenanted to execute a good deed to the 8 associates for their shares, whenever they gave security for the payment of their proportion of the price and expenses.

The title to these two townships having been thus vested in the four, and they having given their associates legal evidence of their rights and interests, immediate measures were taken to survey and divide the townships into lots, and to distribute them among the partners.

Accordingly, on the 25*th* of *September*, 1790, *Arthur Erwin* entered into a written agreement with the company, to survey the townships into lots, for the consideration of £95.   He staked out all the lots in township 4, and part of township 3, before his death, in *June*, 1791 ; but the lines were not closed.   On the 20*th* of *September*, 1791, the associates, by an instrument in writing, appointed *Solomon Bennet, John Jamison* and *Uriah Stephens*, junior, a committee, *to assize and proportion the lots*, and superintend the surveying thereof.   This instrument was signed by 7 of the original associates, and by *Joseph Erwin*, the son of *Arthur*, who professed to be the administrator of his father's estate, and to represent the family in the partition

and division of these townships. Previously to that time, however, it had been discovered by *Phelps* and *Gorham*, that there had been a mistake in the survey of these townships; and that instead of being six miles square, they were about six by eight miles. *Phelps*, in *August*, 1791, sent *Augustus Porter*, who had made the original survey, to correct the mistake. He cut off from the east side of township 3, 12099 acres, and from the north side of township 4, 9406 acres; which reduced them to the size originally intended. *Porter*, at that time, found upon township 3, *Solomon Bennet*, one of the 12 proprietors, who resided there, had made considerable improvements, and was then engaged in erecting mills upon his property. *Porter* staid at *Bennet's* house, who was fully acquainted with the object of his coming; and he, and others who were interested in the two townships, accompanied and assisted *Porter* in making the survey.

The committee appointed by the company, on the 20*th* of *September*, 1791, of whom *Solomon Bennet* was one, in *October* following, after *Porter* had cut off the gores from these lots, employed one *John Dunham*, a surveyor, to complete the survey and subdivision of the township. The directions given to him by the committee were, to close the lines in township 3, which had already been staked out; and to run out the remainder of *the six miles square* into other lots; to be in all 48 lots. In this number were included two, one for *Hadley*, and one for *Elisha Brown*, in the place of two, which, upon a former draft or division, had fallen to their shares; and which, upon *Porter's* survey, proved to be within the gore, and beyond the six miles. The directions to *Dunham*, in relation to the 4th township, were, to run it into twelve lots of equal size, the whole being six miles north and south, and five miles east and west.

Those townships were accordingly divided, conformably to these directions; the proprietors conceding that they had no right to the gores run off by *Porter*. No claim was ever made to any portion of the land included in the gores, by any of the persons interested in those townships.

from 1791 to the commencement of this suit in 1816. The survey and division thus made, was carried into effect by an agreement in writing, signed by several of the proprietors, and by *Joseph Erwin*, who declared himself to be the agent of the *Erwin* family, and professed to act for them. But no other member of the family was present, or participated in any of these proceedings. Nor was there any evidence of *Joseph's* authority to act for them, except what was derived from his own declarations, and their long acquiescence. Conveyances were executed by all the surviving associates, in conformity to the corrected survey of *Porter;* and all their acts and proceedings have practically admitted its correctness.

After the survey of *Porter*, the proprietors, *Phelps* and *Gorham*, treated and disposed of the lands within the gores in the same manner as they did the other parts of their purchase. On the 18*th* of *November*, 1790, they sold and conveyed to *Robert Morris*, the greater portion of their purchase, including the gores. *Morris*, on the 11*th* of *April*, 1792, conveyed to *Charles Williamson;* who, on the 16*th* day of *December*, 1793, conveyed the premises in question to *John Moore*, the defendant. The residue of the tract was conveyed by *Williamson* to Sir *William Pultney*, on the 13*th* of *December*, 1800; and from him, through several descents and devises, it has passed to the trustees of Sir *John L. Johnstone's* will, who are now the proprietors of what is undisposed of. *Robert Troup*, Esq. is their agent, in the management of this immense tract.

*Arthur Erwin*, on the 23*d* of *August*, 1790, purchased from *Christian Kress*, one of the original associates, his share of the two townships; which *Kress*, on that day, conveyed to him by a quit claim deed.

Verdict for the plaintiff, subject to the opinion of the court, on a case; with liberty to either party, to turn it into a special verdict, or bill of exceptions.

*E. Griffin*, for the plaintiff, briefly opened the case; and stated the grounds on which the plaintiff relied. He said he had found no case where the description in the

deed was precisely like that in the conveyance of *September 7th*, 1790; but there are several cases substantially analagous; and he thought the court would find it settled upon authority, that the entire townships, mentioned in the deed, passed to the grantees, without regard to their quantity. (*Cro. Eliz.* 113. 2 *John.* 37. 15 *John.* 471.) He said the words, *to be six miles*, &c. are mere words of computation or description; and if there be a contradiction in the description, the part which is the most certain should be received. If the length of line is to control, from what part is the excess to be cut off? How is it to be located? The words are equivalent to giving lot No. 3, &c. in such a range, going round the tract by lines, boundaries and fixed monuments. Six miles, to such a monument, which is 8 miles, carries us to the monument. *Phelps'* cutting off the excess, shews that he understood the extent of the conveyance perfectly. Nothing has been done by the lessors of the plaintiff, to prevent their claiming according to the full extent of the grant to their ancestor. All the cases of binding location contrary to a grant, are where the parties have agreed and acquiesced for a long time. (7 *John.* 238.)

*Platt*, same side, said he should rely also on the following authorities: *Cro. Car.* 7; 14 *Vin.* 80, *pl.* 21, 24; *Bac. Law. Tracts*, 106; 18 *John.* 81; 2 *Mass. Rep.* 380.

*C. G. Troup* and *J. Emmott*, contra. The words of the deed of 1790, do not embrace the whole of the township of 8 by 6 miles. Both the language of the deed, and all the acts of the associates, show that towns of six miles only were intended. The towns passed by the deed; but were *to be* limited to six miles square. The words *to be*, are strong to shew the intent. The future tense is used, indicating some further act of location or restriction, should it become necessary. The words are not *being so much*, as in the leading authority relied on. (2 *John.* 37.) Probably neither party knew precisely what the contents were. The main view was to the *Canisteo* flats. Neither party acted particularly in reference to quantity. A grant is but the declaration of the owner's

ALBANY,
Feb. 1827.

Jackson
v.
Moore.

will, to transfer what he has to another. (*Hob.* 229.)
There is no technical force in words describing parcels;
though it is otherwise as to the quantity of interest. (*Cowp.*
9. 7 *John.* 217. 18 *John.* 81. *id.* 107.)

The intention of the parties should govern. (*Cowp.*
600. 1 *Burr.* 282. 3 *Atk.* 136. *Willes,* 332.) Here
it is plain. The sale was by count; and when the gran-
tees get their count, the deed is satisfied. We rely on
the words *to be,* as peculiarly expressive of intention.
They meant, if the towns should turn out to be more than
6 miles square, they should be reduced to 6 miles. The
words are restrictive. (*Shep. Touch.* 88. 1 *Co. Rep.*
154, *b.* *Hob.* 275. *id.* 175. 1 *Wood's Convey.* 355,
*Powell's note.* 18 *John.* 110. 2 *Caines,* 327. 5 *John.*
345.) There is no difficulty in the location. The
words of the description are answered, if the towns are
reduced to six miles square in any way. When this is
once done, it is final. *Id certum est quod certum reddi
potest.* (*Shep. Touch.* 250. 10 *Co.* 64. *Hob.* 174. *Perk.*
§ 73. *Bac. Max. Rule* 23. 3 *Bac. Abr. by Gwill,* 391,
*tit. Grants,* (*H.*) 1 *Leon.* 30. *id.* 254. 1 *Rol. Abr.*
725. 14 *Mass. Rep.* 149. 17 *id.* 211 12. 3 *John.* 387.)
A location by a part of the grantees is enough; and binds
the others. A location by one of several grantees will
bind, where the grant is to be located by the election of
the grantees. (*Co. Lit.* 145, *a.*) This need not be done
by the name of location. Any words or acts amounting to
it are sufficient. (1 *Rol. Abr.* 725. *Wing. Max. p.* 21,
*Max.* 15.) If the grantee die before the location is made,
the grant is void. (*Co. Lit.* 145, *a.* 2 *Co. Rep.* 36, *a.*
1 *Leon.* 253. *Hob.* 174. 13 *John.* 212.) It may be void
as to one, but good as to others. (*Sh. Touch.* 81. 4 *Cruis.
Dig.* 313. § 1, *pl.* 8.) In this view, if a location was ne-
cessary, the property never vested in *Erwin* at all.

The cases cited against us, are cases of intention; and
cannot be wrested to pervert the meaning of the parties.
(9 *John.* 267.) They go on the ground that the words of
quantity in the deed, were intended as mere words of de-
scription or estimation. Not so in this case. To call them

so, would be doing violence to the intention of the parties, and the very words they use, which should be taken together. (*Bac. Max. Rule* 25, *p.* 105. 1 *Caines*, 493. 16 *John.* 172.) If it be doubtful whether the words are those of description or restraint, they should be deemed the latter; for the law will not imply that words of erroneous description would be used. (*Bac. Max. p.* 76, *Rule* 13. 8 *East*, 104. 5 *id.* 51, 78, 81.)

Nor let it be said that the words are to be taken most strongly against the grantor. This rule is never resorted to, even in a deed poll, till every other rule of construction fails. (*Bac. Max. Rule* 3.) Here several deeds passed between the parties, in relation to the same subject matter, or at least having the same object in view; viz. towns six miles square. They are explicit on this head; and not only shew the intention of the parties; but for that purpose are to be regarded as one deed; as a single transaction. (1 *Wood's Conv. by Powell*, 355, *note.* 1 *John. Cas.* 91. 15 *John.* 458.) Not only the quantity is given, but we virtually have the length of line which is to fix the the quantity.

But suppose the description in the deed to *Erwin* and others, to be equivocal. It is an ancient deed, (3 *John. Rep.* 295, *id.* 296;) and the usage under it will control as to location. That the cotemporaneous exposition of the parties shall in such a case, be evidence, is a well settled rule. (3 *Atk.* 576, 7. 16 *John.* 23. *id.* 24. 13 *John.* 346, 7. 3 *John. Rep.* 8. 2 *Caines*, 198. 3 *John.* 269. 1 *Caines*, 363. 1 *Cowen*, 621.) The heirs of *Erwin* may be considered as adopting the prior acts of the others; and making them their own, by their long continued recognition and acquiescence. (4 *Bart. Conv.* 379. *Pal. on Agency*, 249.)

Even if the location of the parties was erroneous at the time, the court will not, at this day, disturb the possession. (9 *John.* 100. 17 *id.* 29. 11 *id.* 123. 7 *id.* 238.) Indeed, the court will presume a conveyance, in order to quiet that possession. (6 *Bin.* 416. 10 *John.* 380, 1.)

Again, if *Erwin*, the grantee, had any title to the gore, he held as a trustee with others, (3 *Ves.* 696 ; 12 *id.* 74 ; 5 *John. Ch. Rep.* 12, 18 ;) and on his death, the title survived to the co-trustees. Thus, the *legal* title passed from his heirs by his death. (2 *Cowen,* 229. 1 *R. L.* 54, s 7.) Nor is this a case where the court will presume a conveyance to the heirs from the co-trustees. They will sometimes do so, as between trustee and *cestui que trust.* (2 *T. R.* 684. 8 *id.* 122. 2 *John. Cas.* 321, 5.) But this is only under special circumstances ; as where the equity is plain. (7 *T. R.* 50. 11 *East,* 483. 7 *T. R.* 2, 3. 4 *id.* 683. 8 *East,* 263, 266, 7.) Courts of law never interfere in this way, where the equity is doubtful; (1 *T. R.* 737 ; 2 *John. Cas.* 325 ; 4 *John. Ch. Rep.* 310 ; 5 *id.* 184 ;) or when there are facts to rebut the presumption of a conveyance. (2 *John. Rep.* 226.)

Here is at least a resulting trust, that may be proved by parol. (3 *John. Rep.* 221. 11 *id.* 96. 13 *id.* 63. 16 *id.* 197. 1 *John. Ch. Rep.* 582. 2 *id.* 405.) This resulting trust may exist, whether there be one or more purchasers. The money advanced by the ostensible purchasers was, by arrangement and agreement in writing, for the use of themselves and others. They acted as agents for the 12 associates ; and the trust resulted to the whole. (1 *Atk.* 59, *No.* 414. 2 *Ves. and Bea.* 388. 2 *John. Ch. Rep.* 410.)

Lastly, the claim of the plaintiff is barred by the statute of limitations.

*J. Platt*, in reply. There cannot be a doubt, upon the various cases decided by this court, that the whole of the two townships passed to the four grantees, whether those townships were more or less. On this point, we have referred to the leading cases ; nor need we do more. They are in point to the principles of construction for which we contend. If the deed be not good for the whole, it is void for uncertainty. No human being can tell where the six miles should be taken. If there was a mistake, a court of equity alone is competent to relieve. The townships had been surveyed, and their boundaries known and

fixed; and referred to in the grant. The grantor was bound to know the quantity, at his peril. The acts of survey, grant, and location, were all his own. The deed locates itself.

We deny that here was a trust, within the meaning of the statute which saves the doctrine of joint tenancy. That means a declared or technical trust; not one existing merely in the minds of the parties. Here was no trust which could ever be enforced as such, either at law, or in equity. If it is relied on as a resulting trust, that may be, and is, in this case, repelled by parol evidence. (2 *John. Ch. Rep.* 405. 5 *John. Ch. Rep.* 1. 16 *John. Rep.* 197.)

At any rate, here was no trust as to the one twelfth, which was to be alloted absolutely to *Erwin*, or the other one twelfth which he purchased of *Kress*. In these portions, *Erwin* had both the equitable and legal estate.

*Curia, per* SUTHERLAND, J. The plaintiff, if he can recover at all, is entitled, under the demise from the *Mulhollens*, the *grand* children of *Arthur Erwin*, to 7-8 of 1-10, of 2-12 of the premises in question. Upon the same principle, he is entitled to that proportion of the residue of the 22000 acres, included in the gores. The case, therefore, is important, not only in principle, but in the extent of property which may be affected by its decision; and deserves, as it has received, the most deliberate consideration of the court.

The first question which arises is, as to the construction of the deed of *September* 17th, 1790.

It will be recollected that the terms of that deed in its discriptive part, are, "two tracts or parcels of land, situate in the district of *Erwin*, in the county of *Ontario*, being township no. 3, in the 5th range, also no. 4, in the 6th range, to be six miles square, and containing 23040 acres each, and *no more*. If, instead of this verb *to be*, the phraseology had been *being* six miles square, and containing 23040 acres each, there is no question that the whole lots would have past, whatever might have been their size and contents. (1 *Caines*, 493. 2 *John.* 37.) A lot

may be as precisely and definitely described by its number, as by metes and bounds. A large portion of the land in the western district of this state, is held under conveyances containing no other description or designation of the premises intended to be conveyed, than the number of the lot; and it is perfectly settled, that when a piece of land is conveyed by metes and bounds, or any other certain description, all included within those bounds, or that description, will pass, whether it be more or less than the quantity stated in the deed. And when the quantity is mentioned, in addition to a description of the boundaries, or other certain designation of the land, without an express covenant that it contains that quantity, the whole is considered as mere description. The quantity being the least certain part of the description, must yield to the boundaries or number, if they do not agree. (*Jackson* v. *Barringer*, 15 *John.* 471. *Powell* v. *Clark*, 5 *Mass. Rep.* 355.) If a man lease to another the meadows in *D.* and *S.* containing 10 acres, and they in truth contain 20, all shall pass. (13 *Vin. Abr.* 79, *plac.* 24.)

In construing deeds, effect is to be given to every part of the description, if practicable; but if the thing intended to be granted, appears clearly and satisfactorily from any part of the description, and other circumstances of description are mentioned which are not applicable to that thing, the grant will not be defeated; but those circumstances will be rejected, as false or mistaken. (*Cro. Car.* 447, 473. *Jackson* v. *Clark*, 7 *John.* 217. *Jackson* v. *Loomis*, 18 *John.* 81. 4 *Mass. Rep.* 146. 5 *East*, 41.)

What is *most material* and *most certain* in a description, shall prevail over that which is *less material* and *less certain*. Thus, course and distance shall yield to natural and ascertained objects; as a river, a stream, a spring or a marked tree. (1 *Cowen*, 612. 5 *Cowen*, 371. 6 *Wheat.* 582. 7 *Wheat.* 10.)

To apply these principles to the case before us: It is contended by the defendant, that the words, *to be* six miles

square, *and containing* 23049 *acres and no more,* are words of restriction ; and that they limit the grant to the size and quantity expressed.  It is not pretended that they amount to a covenant.  They are in the descriptive part of the deed, and form a portion of the only sentence which attempts to designate or describe the premises intended to be conveyed.  The whole clause is undoubtedly to be considered as matter of description merely.

The parties to this deed unquestionably intended, that it should operate as a complete and perfect conveyance. No subsequent survey was contemplated by them, as necessary to the location of the grant.  The lots had previously been surveyed, and their corners marked by *Porter.* It is not an executory contract, but the consummation of an executory agreement, made in *August,* 1789 ; and by adverting to that contract, we shall perceive how the verb *to be,* came to be used in the conveyance, instead of the participle *being.*  That contract was made in *August,* 1789, before the townships were run out.  It was for two townships of land, *to be* so located, as to embrace the *Canisteo* flats ; and *to be* six miles *north and south,* and five and a half miles *east and west.*  When the deed came to be drawn, the contract was undoubtedly referred to, as containing the stipulations between the parties ; and the conveyancer adopted the phraseology of the executory agreement, without adverting to the fact that a survey had subsequently been made, and the towns run out, and their corners marked, and their size thereby ascertained. The acts of the grantees and their associates, show that they considered the conveyance as perfect ; and that no subsequent survey was to be made, nor any thing else to be done on the part of the grantor.  They immediately proceeded to locate their deed, and to subdivide the townships among the proprietors.  The acts of *Phelps,* also show that he entertained the same opinion ; for as soon as he ascertained that the townships were more than six miles square, he had the excess run off, without any application to, or consultation with his grantees.  The original parties, and their grantees, have proceeded through-

ALBANY,
Feb. 1827.

Jackson
v.
Moore.

out upon the admission, that their rights were definitively settled by the deed ; and that the only question was as to its construction. No future or prospective sense is therefore to be attached to the words "*to be.*" Every thing was complete and executed. The whole descriptive part of the deed was intended to designate a *present* subject of conveyance. To put a different construction upon it, would be inconsistent with the very nature of the transaction, and the manifest intention of the parties.

The words, "township no. 3, in the fifth range," constituted, of themselves, a perfect description ; and designated the subject of the conveyance, beyond all doubt or ambiguity. If no other terms of description had been used, there would have been no difficulty in locating the grant, nor any doubt that the whole township would have passed. The subsequent part of the description, "*being, or to be, six miles square,*" &c. is inconsistent and irreconcileable with that which preceded it. The one or the other must, therefore, be rejected. We have seen that that must be retained which is most certain and most material ; and that the number of the township is, of itself, a perfect description. If the number of the township be rejected, there is no description left. It is a tract of land in the district of *Erwin* and county of *Ontario*, six miles square, and containing 23049 acres; but in what part of the district or county, there is no means of ascertaining. The grant would, therefore, be void for the want of a sufficient designation of the subject. But suppose those terms to be retained, and to operate by way of restriction or limitation ; how are the six miles square to be located ? From which part of the lot is the excess to be taken ? From the *north*, the *east*, the *west* or the *south* side ? The truth is, that no location could be made under the deed upon that construction ; and it would have been void for uncertainty. Upon what principle did *Phelps* ascertain that the excess was to be taken from the *east* side of township 3, and the *north* side of township 4 ? Could he have recovered those portions of the townships from the proprietors, if they had been in possession, in an action of

ejectment? Unquestionably not. The rule of construction, contended for by the defendant, would lead to all these difficulties, and would be subversive of the whole grant.

The size and contents of the townships must, therefore, be considered as false or mistaken circumstances of description; and must yield to the precise and certain designation of the range and number of the townships.

We are accordingly of opinion, that the whole of township no. 3, as originally surveyed by *Porter*, including the premises in question, passed by the deed from *Phelps*, of *September 7th*, 1790. (*a*)

(*a*) The English authorities upon this point, do not vary from the American. The doctrine of parcels was very fully considered by several of the ancient, and some of the modern English books. These were fully referred to on the argument of the principal case, by the counsel for the defendant. Most of the ancient authorities were gone over in *Stukeley* v. *Butler*, (*Hob*. 168;) and both ancient and modern are summed up and illustrated by *Preston*, in his *Essay on abstracts of English titles*, vol. 3, 205 to 210, 2d *Lond. ed*. This work combines authority with the present opinions and practice of English conveyancers.

"Respecting the parcels," says *Preston*, "the general rule is, *nil facit error nominis cum de corpore constat*, (11 *Co*. 21;) and *falsa demonstratio non nocet*. (*Bac. Elements. Wing. Maxims.*)

It is fit, and therefore required, that things should be described by their proper names; but though this be the general rule, it admits of many exceptions; for things may pass under any denomination by which they have been usually distinguished. (*Finche's case*, 6 *Rep*. 66.)

When there is a sufficient certainty of demonstration; as in the case of a grant of "all my messuage and farm, called *A B*," no subsequent error in the descriptive circumstances will vitiate the grant. Thus, if the grant be of "all that my messuage or farm, called *A*, now in the occupation of *B*," the farm called *A* will pass, although, in point of fact, the farm be in the occupation of *C*, and not of *B*; for the false demonstration by the name of the occupier will not vitiate the grant. This conclusion is quite consistent with the rule that *utile per inutile non vitiatur*.

But when a man has a manor called *A*, extending into the several parishes of *B* and *C*; and he grants "all that his manor in the parish of *B*," the words, "in the parish of *B*," would be restrictive; and so much only of the manor as is situate in the parish of *B*, would pass.

Another distinction is also to be taken, between a grant of lands by specific names or by positive certainties, and a grant of land in general terms consisting of different circumstances; (*ex grat.*) a grant of land, called *A*, will be good to pass these lands, notwithstanding a mistake in the name or the parish, *or of the abuttals*, or of the name of the tenant; when the name of the parish or of the tenant is, or the abuttals are, given only for the greater certainty. So, if there be

The deed is not ambiguous, in a legal sense, so as to be subject to explanation or elucidation from extrinsic evidence.

The next inquiry is, whether the lessors of the plaintiff are concluded by a practical location of their deed, or an acquiescence in the corrected survey of *Porter*? It will be we recollected that *Arthur Erwin* died in *June*, 1791; that the gores were not run off by *Porter*, until the month of *August* in that year; and that no practical location was made, as to that township, by a survey and divis-

---

a grant of the lands, or the farm called *A*, " which descended to me from my father," these lands thus described by name will pass, although in point of fact they descended from the mother; but when there is a grant of " all lands which descended to me from my father," no lands can pass except such as descended in that manner; and the grant will fail of effect, unless there were some lands answering the description of lands descended from the father. A court of equity may correct the mistake, on proper evidence; but in a court of law the mistake does not admit of any explanation

It will also be collected from the cases given by *Bacon*, in illustration of the rule, "*falsa demonstratio non nocet*," that in descriptions by positive certainties, it is sufficient that the first certainty be true, and subsequent errors will not destroy the grant; but when the grant is in general terms, by a reference to several circumstances, every circumstance forms an essential part of the description, and an error in one of them will be fatal. (*Doddington's case*, 2 *Rep.* 32, *b. Preston's Shep. Touch.* 246, 247.) The following instance may illustrate this observation:

Under a grant of " all my lands, which were formerly the inheritance of my grandfather, and also the inheritance of my father," no lands will pass except those in which each branch of the description can be authenticated by evidence; and the grant would fail of effect, although there were lands which were the inheritance of the grandfather, unless they also descended from the father; and lands which descended from the father would not pass unless they were formerly the inheritance of the grandfather. So when there is a grant of all lands which were the inheritance of A. B., and conveyed by C. D., the lands will not pass unless they were conveyed by C. D., and also were the inheritance of A. B. Hence it seems an error, or at least inconvenient, in the assignment of terms, to refer, as is commonly done, to the lands as being the lands which were assigned by certain indentures bearing date, &c. and afterwards assigned by certain indentures bearing date, &c. &c. &c.; since the description is multiplied, and an error in either branch of the description would be fatal. But let it be remembered, that when the several deeds to which reference is made, are for the purpose of embracing lands under distributive descriptions, so as to comprise lands described in one deed, and lands described in another deed, the different lands may well pass; and an error in one of the deeds will not affect the validity of the grant, as to other lands included in a deed correctly described.

Another rule marks the difference between a description which is entire, com-

ion among the associates, until *October* following. *Sarah,* the daughter of *Arthur Erwin,* and the mother of his grand children who are lessors, was at that time a feme covert. She was married in 1777, and died in 1809. Her husband, *Mulhollon,* survived her, and died in 1815. There has, therefore, been no participation or acquiescence, on the part of the lessors or their ancestors in the locations made, by which they are concluded. The cases upon the subject of location by the acts of the parties, and from long acquiescence, have, therefore, no application. (4 *John.* 140. 7 *John.* 238. 9 *John.* 100. 11 *John.* 123. 17 *John.* 29.)

The acts and declarations of *Joseph Erwin,* cannot affect the lessors. There is no evidence that he was the

---

pounded of many circumstances, and a description which consists of several branches, which are distinct. In the first instance, the grant will fail unless every circumstance be true : in the latter instance, the grant may be good, if there be sufficient certainty, though some of the circumstances be not correct. The cases involving this point turn on nice and refined distinctions.

In reference to this class of cases also, this difference is taken : *if the first part of the certainty be true, the latter part, if false, shall be rejected ;* while if the first branch be incorrect, the error cannot be cured by the relevancy of the latter part of the description ; and whenever all the circumstances admit of application, they shall be retained in construction, and be restrictive, and have full effect ; so as to exclude lands which do not fall within the restrictive terms. (*Ognel's case,* 4 *Rep.* 50.)

These and the like instances depend on the rules of evidence. When the deed of grant does not contain any certain description, but there is a description by circumstances, and all the circumstances may be essential to distinguish the lands intended to be granted, the law requires all the circumstances to be proved ; and will not suffer any lands to pass except those which fall within the terms.

But when there is a grant of all the farm called A, it is sufficient, (*Plowd.* 191, 2. 8 *T. R.* 104,) for the person who would avail himself of that grant, to rely on this description of the farm ; and if there be any circumstances of identity, from the parish, or the name of the tenant, or any other fact introduced into the grant, the other party must show its irrelevancy by proving its application to other lands ; thus making it appear that some other farm was intended to pass, or that the circumstances of identity were used as a qualification, in order to abridge the meaning of the word "farm," and confine it to particular lands of a given description.

The following cases will best explain the numerous difficulties and nice distinctions in which this subject is involved : *Doddington's case,* 2 *Rep.* 32 ; *Prest. Shep. Touch.* 244, 246 ; *Doe* v. *Greathed,* 8 *East,* 91 ; *Ognel's case,* 4 *Rep.* 48 ; *Stukely* v. *Butler,* *Hob.* 170 ; *Goodtitle* v. *Paul,* 2 *Burr.* 1089.

authorized agent and representative of any portion of the *Erwin* family. He must be considered, therefore, as speaking and acting for himself alone. That the lessors have accepted their portion of the townships, as ascertained by the division made upon *Dunham's* survey in 1792, is highly probable, though it does not appear from the case. It does appear from the testimony of *Thomas M' Burney* and *Dugald Cameron*, that other members of the family have paid the taxes upon their undivided portions of the *Erwin* share ; but even that fact is not proved in relation to the *Mulhollons*.

ALBANY,
Feb. 1827.

Jackson
v.
Moore.

It is not a case in which a grant will be presumed, for the sake of quieting ancient possessions. It is the ordinary case, of a legal title on one side, and an adverse possession short of twenty years on the other; unsupported by any admission or recognition of right derived from the acts or declarations af the lessors of the plaintiff, or those under whom they claim. In *Jackson* v. *Lunn*, (3 *John. Cas.* 109,) a deed from the original patentees to Sir *Peter Warren* was presumed, under the following circumstances: The patent was granted in 1735 ; and the tract immediately surveyed and laid out into lots. In 1736, Sir *Peter Warren* asserted his claim to the whole tract ; and took possession of it, by executing *eleven leases*, for different lots, to different persons, for lives, with a reservation of rent; and by putting the lessees into possession of the demised premises. In 1737 and 1742, he paid the quit rents on the whole tract, and died in possession in 1752, by which the descent was cast upon his heirs. In the year 1767, these heirs leased two other lots, reserving rent; and at the commencement of the revolutionary war, there were about 100 settlers on the land, all of whom acknowledged the title of the heirs. The defendant came into possession about 35 years after the first entry by Sir *Peter Warren ;* and the court remark, that it is necessarily to be inferred, from the case, that he entered in subordination to his claim ; as it is stated that that claim was not disputed, and consequently was admitted by *all* the settlers, until many years after the entry of the defendant.

The defendant showed no title ; but relied upon his posses-
sion, and the title which was shown in the original paten-
tees, and which he contended, upon the evidence in the
case, had never been conveyed to Sir *Peter Warren*. It
was held, however, that, from the facts in the case, a deed
from the original patentees to Sir *Peter Warren* was to be
presumed. In *Jackson* v. *M'Call*, (10 *John.* 377,) the
question was as to the division line between two lots.
The lots had been held and occupied according to the line
set up by the defendant, for 41 years. The occupants on
both sides, and especially *the ancestors of the lessor of the
plaintiff, and the lessor himself,* by building a stone wall on
that line, had recognized it as the true line ; and the court
held that it ought not to be disturbed. The lessor of the
plaintiff professed to hold his lot as patented to one *Pro-
vost*. No patent was produced or proved ; but an order
of the colonial council in favor of *Provost*, dated the 8*th*
of *February*, 1764, directing a survey, and a sworn copy
of a survey made by the surveyor general in pursuance of
that order, were produced and proved. A subsequent
patent was proved, which was bounded on the *Provost*
patent. The court thought the evidence warranted the
presumption that the ancestor of the lessor of the plaintiff
was in possession as early as 1776, under a claim of title ;
and upon his death the descent was cast upon the lessor,
who retained the possession at the time of the trial, in
1812. Upon this state of facts, the court remark, "we
are then to conclude, that the father purchased the *Pro-
vost* title at an early day ; and from the fact of the order
of the council, and the original survey by the government
in 1764, and the recognition of it in the patent to *M'Ken-
zie*, in 1765, and the continual and undisturbed possession
by the family of the lessor, (for 36 years,) a patent to
*Provost*, and a deed from him to the elder *M'Donald*,
might even have been presumed, for the sake of quieting
the possession."

The distinction between these cases, and the one at bar,
is too apparent to require illustration.

ALBANY,
Feb. 1827.

Jackson
v.
Moore.

A grant of land will never be presumed, unless the lapse of time is so great as to create the belief that it was actually made; or unless the facts and circumstances in the case, show that the party to whom it is presumed to have been *made, was legally or equitably entitled to it.* (1 *Cowp.* 102. *Bull. N. P.* 74. 3 *T. R.* 157, 8, 9. *Phil. Ev.* 121, *et sequ.; and* 129, *note* (*a*).) None of those circumstances exist in this case.

If the whole townships passed by the conveyance of *September*, 1790, as we hold they did, then there certainly was no legal obligation on the part of the grantees to reconvey any part. Nor were they equitably bound to do it. If the township had contained less than was supposed, they would have had no claim on the grantor for the deficiency. The parties took their chance as to the size and contents of the townships; and neither was legally or equitably responsible for the result.

Those of the proprietors who have recognized the title of *Phelps* to the gores, would probably be concluded by such recognition. But the lessors of the plaintiff cannot be affected by their acts.

The only remaining inquiry is, whether *Arthur Erwin* had *a legal interest* in the two townships to any extent, which descended to his heirs. The defendant contends that *Erwin, Bennet, Thomas* and *Stephens*, to whom the conveyance was made by *Phelps*, were trustees for the 12 associates; that they, therefore, held those townships as *joint tenants*, within the exception in the 6th section of the act, " regulating descents," &c. (1 *R. L.* 54;) and that, upon the death of *Erwin*, the *legal* title survived *to his co-trustees.*

The trust is not declared on the face of the deed. It is an absolute conveyance, in fee, *to the four grantees.* It is necessary, therefore, to resort to the instrument by which the trust is declared or proved, in order to ascertain its nature and extent. A trust, (other than a resulting trust,) must be manifested or proved *by writing;* though it may be created by parol. And the declaration of trust

Jackson
v.
Moore.

need not be made at the time of the purchase. It may be subsequently, or, as I apprehend, in contemplation or anticipation of it. (3 *Vesey*, 696. 5 *John. Ch. Rep.* 12.)

The trust, in this case, is proved by the covenant or agreement of the 18*th* of *October*, 1789, between the four grantees of the one part, and their eight associates of the other. This was after the contract for the purchase was made with *Phelps;* but before the deed was executed. The grantees covenanted to convey to their associates $\frac{8}{12}$ of the purchase, upon their paying $\frac{8}{12}$ of the consideration money and costs; and the associates covenanted to make those payments in 3 annual instalments. Whether this is to be considered a declaration of trust, or only a re-sale, it is not material to inquire; for if it be admitted to be the former, it proves a trust only as to $\frac{8}{12}$; leaving the grantees seized in their own right as tenants in common as to the residue. Holding the legal estate of the $\frac{8}{12}$, subject to the equitable interest of their *cestuis que trust*, no legal objection is perceived to their being joint tenants, so far as their legal estate was affected by the trust; and tenants in common as to the residue. The covenant of the 8 associates or *cestuis que trust*, bound them to pay their portion of the consideration in three annual instalments. There is no evidence that any portion of this money was paid, *before, or at the time of* the purchase or deed from *Phelps.* In order to raise a resulting trust, strict proof is required; and the payment of the money at the time of the purchase, is indispensable. A subsequent payment would not raise the trust. (2 *John. Ch. Rep.* 409. 5 *id.* 19. 2 *Atk.* 71.) There is, therefore, no ground for contending that there was a resulting trust, in this case, which might be proved by parol.

*Kress*, one of the *cestuis que trust*, conveyed his $\frac{1}{12}$ to *Erwin*. Thus he had both the legal and equitable estate in $\frac{2}{12}$. For these he had paid his money; and even if the deed had been taken in the name of another, upon a consideration paid by him, the trust would have resulted to him. (2 *John. Ch. Rep.* 405. 16 *John.* 197. 3 *John.* 216.)

As to the $\frac{2}{12}$, then, there could have been no survivorship. Suppose the 8 *cestuis que trust* had conveyed all their interest to the 4 grantees; would not the effect have been, to have extinguished the outstanding equity, and to have left them seized, as they would have been, if it had never been created? that is, as tenants in common, the share of each to descend to his heirs?

Without deeming it material to determine whether the statute applies to any other than *pure trusts, declared on the face of the deed, such as trusts to executors to sell or to trustees to sell for the benefit of creditors,* we are clearly of opinion, that there was no survivorship as to the $\frac{2}{12}$ which belonged to *Arthur Erwin,* and that the legal title to these descended to his heirs.

The plaintiff is, therefore, entitled to recover $\frac{7}{8}$ of $\frac{1}{10}$ of $\frac{2}{12}$ of the premises in question, upon the demise of the children of *Sarah Mulhollon.* She was married in 1777, before the death of her father; she was covert until 1809, and her husband survived until 1815. The 10 years after her death, allowed for the children to bring their action, had not expired when this suit was commenced. They are, therefore, not barred, within the case of *Jackson* v. *Johnson,* (5 *Cowen,* 74.)

Judgment for the plaintiff *pro tanto.*