PETER O'SHEA ET AL., APPELLEES, V. COMMODORE C. HAMP-
TON, APPELLANT.

FILED MAY 15, 1934. No. 28953.

*White & Heiss,* for appellant.

*J. M. Fitzgerald* and *Mothersead & York, contra.*

Heard before Goss, C. J., Good, Eberly, Day and
Paine, JJ., and Tewell, District Judge.

Goss, C. J.

This is an action for damages for an alleged shortage
of the number of acres in a farm purchased of defendant.
There was a verdict for plaintiffs for $1,006.40, on which
judgment was entered.

June 30, 1919, defendant (joined by his wife) entered
into a written contract with Peter O'Shea to sell and con-
vey to him on March 1, 1920, a certain quarter section
and three (government) lots connected therewith, located
on the south side of the Platte river near Gering, in
Scotts Bluff county, "containing 248 acres, more or less,
according to the United States government survey."
March 1, 1920, Hampton and wife conveyed the land to
Peter O'Shea and Charles L. Schuler (O'Shea's nominee)

by warranty deed containing the same description and acreage as above quoted.

The amended petition of O'Shea and Schuler, plaintiffs, alleged that at the time of the purchase "the defendant represented to the plaintiffs that there was a total of 250 acres of land in said tract and it was agreed between the parties that the price of said land should be two hundred (200) dollars per acre;" that the contract was so prepared, but, before signing, defendant stated that he had made a mistake in the actual acreage and so the proposed contract was changed to show 248 acres; that as an inducement to plaintiffs to purchase the land defendant "represented and warranted said tract of land to contain 248 acres; that relying on said representations and warranty, as aforesaid, plaintiffs purchased said land; that in truth and in fact said tract of land contained but two hundred thirty-eight (238) acres, which fact was unknown to plaintiffs and plaintiffs would not have purchased said tract of land for said price if they had known that it did not contain two hundred forty-eight (248) acres." They allege the land was worth $200 an acre and that they have been damaged $2,000, for which they pray judgment.

The answer admitted the execution of the contract with O'Shea and the execution and delivery of the deed to O'Shea and Schuler, but denied all other allegations of the amended petition.

Schuler died and revivor in the name of his administrator was duly entered.

The case was tried upon the theory, not of fraud, but of mutual mistake in the representation and understanding of the acreage of the tract and that it was a sale of the farm by the acre and not a sale in gross, plaintiffs claiming it was by the acre and defendant claiming it was in gross.

There was testimony of Peter O'Shea, one of the plaintiffs, who was engaged in the real estate business, that Hampton had listed the farm with him for sale and had

described it as containing 250 acres and had listed it at $200 an acre. When he agreed a few days before the execution of the contract to purchase the farm for $50,-000, he engaged the late P. J. Barron to draw the contract and it was drawn to cover 250 acres. On the day it was executed O'Shea, Barron and a notary went to the Hampton home to secure the execution of the contract. Hampton in their presence read the contract very carefully and suggested three or four changes. One of these, **after a conversation with his wife, was to change the 250** acres to 248 acres. These changes were made in ink by Barron, as the latter testified.

Copies of government maps, filed January 22, 1878, in the General Land Office, duly exemplified, showing the government survey of these lands in 1877, were offered by defendant and received in evidence. The original government survey showed 247.25 acres in the tracts. This shows all the land to the then meander line or the south river bank.

Plaintiffs introduced the testimony of J. G. Marzel, taken by deposition, and a map made by him. This survey was made October 23, 1920, at the instance of plaintiffs, and the map and testimony of Mr. Marzel show 238.2 acres actually in the farm up to the then river bank. He testified that the meander line as shown on his map was farther inland than the meander line shown on the government map. At the time his deposition was taken he was state geologist for Wyoming. He had been a surveyor for 22 years. He testified that, at the time he surveyed the land, the river was at flood stage and there was evidence of erosion of the river bank of the farm. In surveying the south, east and west sides of the farm he used a general land office map made from the government field notes and in the survey actually located certain government corners. Of course, the river having eroded its south bank, these notes did not fix the present line there. Marzel did not survey the government meander line of the river as it existed in 1877,

nor did he indicate it on his map. His survey and map are criticized by appellant largely on the ground that the evidence of location of government monuments was not established, but that goes to the weight of the evidence rather than to its competency. To go into details as to the points of the government survey of which he claims to have found evidences, the cross-examination thereon and the evidence on behalf of defendant seeking to prove his errors would be burdensome and not of value here. The map might be considered as correct so far as it goes; that is, as far as the land above water at the time of the survey is concerned.

So, assuming the Marzel survey was correct in following the government survey as to the south, east and west lines of the farm up to the river bank, yet it failed to show how much acreage there was in the farm "according to government survey" as required by the contract and the deed, both of which were prepared in that form at the instance of plaintiffs themselves. It does not show, as it should have done, the government meander line. It does not show the distances along the river bank on its own meander line which ran in a somewhat southeasterly direction. It does show the total east and west linear distance across the farm along the south boundary of the government lots is 3,986.5 feet. However, a fine scale rule, applied to the meander line from point to point of the meander angles indicated, shows a total meander line of 4,117.5 feet along the south bank of the river when the survey and map were made on October 23, 1920. This proves from the evidence of plaintiffs that, to produce a shortage of 10 acres in the original government survey, the meander line of the government survey is, on the average, less than 106 feet north of the line fixed by the Marzel map. The evidence shows that the land along the river was greatly inferior in quality and value to that on the south part of the farm. Though the court,

whether properly or improperly we do not decide, instructed the jury in effect to take the purchase price an acre and multiply it by the deficiency in the number of acres in order to assess the recovery, the jury allowed only about half that amount.

All possible errors are assigned, chief of which is that the judgment is not sustained by the evidence. The question is whether the farm was sold in gross for $50,000 or whether it was sold by the acre; if the latter, was there such a discrepancy between the 248 acres described in the contract and deed on the one hand and the actual acreage of the farm as to warrant a recovery?

*In re Estate of Robinson,* 105 Neb. 1, was a case involving an action for damages for shortage in the width of a lot on O street in Lincoln, the whole width of which, so far as possession could be and was delivered under the deed, was covered by a brick building. The deed described the property as lot 20, block 44. The record plat described the lot as being 25 feet wide and 142 feet long. The actual width of the building, due to 9 inches encroachment of a building east of it was only 24 feet and 3 inches. It was held that "the purchaser is not entitled to an abatement in the purchase price unless it appears that fraudulent representations were made by the vendor as to quantity that induced the vendee to purchase." The opinion reviews cases from many states and concludes that the decision is in harmony with the great weight of authority, has prevailed from an early day and is a reasonable rule. Several of the cases hold that any surveyor could easily have determined the quantity of land contained within the limits and plaintiff might have known the quantity before he purchased, by taking proper measures.

In *Anthony v. Hudson,* 131 Ky. 185, it was held: "A contract to sell land in Illinois, and the deed thereafter given, both recited that the tract sold contained so many acres, 'according to United States survey,'

and the contract also recited that the gross amount of the purchase money was at the rate of $105 per acre. Held, that the sale would be considered to be in gross, and not by the acre." It cites numerous cases and text-books in support.

In Illinois, where the land involved in the Kentucky case was situated, the general rule seems to be as stated in *In re Estate of Robinson,* 105 Neb. 1. For in *Wadhams v. Swan,* 109 Ill. 46, it was said: "The general rule unquestionably is that where a tract of land is sold for a sum in gross, by its proper numbers, as indicated by the government survey, or by any other specific description by which its exact boundaries are or may be determined, the boundaries to be thus ascertained, in case of a discrepancy, will control the description as to the quantity or number of acres, and in such case neither the purchaser nor the vendor will have a remedy against the other for any excess or deficiency in the quantity stated, unless such excess or deficiency is so great as to raise a presumption of fraud. *Jackson v. Moore,* 6 Cow. 717; *Noble v. Googins,* 99 Mass. 231."

The words "more or less" indicate a sale in gross. 18 C. J. 289; 20 Am. & Eng. Ency. of Law, 875; *Rathke v. Tyler,* 136 Ia. 284. Though in the Iowa case, where the description was by metes and bounds, of an irregular tract described as "containing one hundred acres, more or less," and an early survey promptly taken advantage of by the vendee, disclosed a shortage of 6.41 acres, the court held under the evidence there was a sale by the acre and that the shortage was sufficient to afford relief.

But in the instant case the description was not by metes and bounds but was by government sections and lots "according to government survey." In 20 Am. & Eng. Ency. of Law, 873, the general rule, supported by a large number of cases from many states, is put in the following language: "The words 'more or less'

in a deed, after a quantitative recital as to the number of acres, imply a waiver of the warranty as to the specific quantity on the part of the buyer and an agreement on the part of the seller not to demand more than the fixed price, although on the one hand there should be an excess or on the other a deficiency in the quantity supposed, both parties being willing to abide by such presumptive or probable evidence of the quantity as they were then possessed of, but of which neither pretends to have an accurate and perfect knowledge, and which neither insists upon as a condition annexed to the purchase or sale. By the use of these words, the statement of the number of acres becomes descriptive merely, and not of the essence of the contract. There is a mutual risk by the vendor as to the sum of money, and by the vendee as to the quantity of land. If there be a small portion more than the quantity, the vendor cannot recover it; and if there be a small quantity less, the purchaser cannot obtain any compensation in respect of the deficiency."

In the case at bar, a day or so before the contract of sale was made, O'Shea went to Hampton and offered Hampton $48,500 for the farm. Hampton refused it, saying he would not take less than $50,000 for the place. A day or so later O'Shea appeared with his attorney and notary. Before disclosing that he had the contract already prepared, O'Shea found Hampton down by the barn and asked him if he would take $49,500 for the farm. Being answered in the negative, he said, "Come on up to the house and we will fix it up." When the contract was produced and the changes heretofore recited were made, O'Shea made no suggestion that the price ought to be abated because the acreage according to government survey was reduced in the contract. He and Schuler, the grantees in the deed, on June 30, 1919, paid the $5,000 down on the contract, made the payment of $20,000 and obtained their deed March 1, 1920, having satisfied themselves that the title

was "marketable," made the mortgage for $25,000 due on or before March 1, 1930, obtained the Marzel survey October 23, 1920, showing that the actual land then in the contract was 9.8 acres short of the 248 acres stated in the deed, continued to pay the interest on the mortgage and made no complaint until this suit was brought. The transcript here does not show when the action was commenced, but the amended petition was filed January 4, 1928. That is the first date indicative that any suit was pending.

We are of the opinion plaintiffs ought not at so late a date to be permitted to claim and set up a shortage in the acreage. We think the evidence and circumstances clearly show that they bought the farm in gross, not by the acre. The shortage alleged is of course attributable partly to erosion and partly to the high water at the time the Marzel survey was made. Even assuming it is about 9 acres, there is not sufficient in the circumstances of this case to warrant recovery.

For the reasons stated, the judgment is reversed, with directions to dismiss the action.

REVERSED.