## Jos. M. Bell & als., Administrators v. James Woodward.

In order to ascertain the true intent of the parties to a conveyance, and carry the same into due effect, the court will examine and give a reasonable construction to all the language of the instrument, and will reject no part of the description, unless found repugnant to the manifest purposes of the grant.

Where the description in the deed is indefinite and doubtful, and susceptible of more than one application, thus constituting what is known as a latent ambiguity, the court, to remove such ambiguity, may resort to extrinsic evidence, and thus restrain, confine and apply the description to a single object. In such cases, the court, in order to define and locate the lands, will look at their true relative position at the time of the conveyance, their boundaries, use or occupation, the situation of the parties, and all the material circumstances surrounding the subject matter of the conveyance. In this case, either party may be permitted to show by parol testimony what lands made up and constituted the Samuel Ladd farm, and to the same extent may also show what lands made up the Ward farm, at the time of the conveyances in 1842 and '44, from Woodward to Bell. In cases of doubt the acts done under the deed will be regarded as giving a true practical solution to the intent of the parties.

The declarations, accompanying the possessory acts of the party claiming title, especially those made in disparagement of his title, or tending to qualify the same, will be held admissible as part of the res gestae.

As a defense and answer to plaintiffs' bill, the defendant would have the right to show the actual title to the Samuel Ladd farm in himself, or the equitable title by the purchase in a due assignment of outstanding incumbrances to himself, and that such incumbrances existed upon the said farm in third persons, at the time of the conveyances to Mr. Jos. Bell, by Joshua Woodward.

Joshua Woodward having deceased, the bill abates as to him. His representative is to be brought into court by a bill of review.

If Joshua Woodward be regarded as holding no pecuniary interest in the estate, claimed by plaintiffs, the defendant would be entitled to use his deposition, taken previous to the filing of the present bill.

If plaintiff elect to bring into court the legal representative of Joshua Woodward, there is evidence enough to show that he would represent a pecuniary interest in the lands embraced in the bill. Therefore the deposition of said Joshua cannot be received, as testimony, in behalf of his original co-defendant.

Issues from chancery. The plaintiffs, as administrators of the es-

tate of the late Joseph Bell, brought their bill against the defendants, to foreclose two mortgages made by Joshua Woodward deceased, to said Bell, the first dated Feb. 28, 1842, and the other Sept. 4, 1844. The defendants pleaded that the said mortgages did not include the land described in the bill, known as the Samuel Ladd farm, and moved that the question be tried by the jury, and the same was ordered by the court. The issue joined was in the form following :

| GRAFTON, SS. | JOSEPH M. BELL & ALS. ADM'RS, |
| Supreme Judicial Court, | *v* |
| March, 1864. | JAMES WOODWARD. |

And the plaintiffs say, that the description in the mortgage deed of Joshua Woodward to Joseph Bell, dated the 28th day of February, A. D., 1842, and recorded in Grafton county records, lib. 168, fol. 136, did include the Samuel Ladd farm, so called, being the same land which Joshua Woodward mortgaged to Phillip Goss and Martha Goss his wife, on the 23d day of November, A. D., 1840. And of this they put themselves on the country, by their attorneys, N. W. Westgate, Albert R. Hatch ; and the defendants do the like by their attorneys, N. B. Felton, H. Hibbard.

· Another issue is in the same words, except that the deed of mortgage referred to, is that dated September 4, 1844.

The first mortgage conveyed "all the farm in said Haverhill, lying on both sides Ladd street, so called, on which I now live, and which I now carry on, estimated at one hundred and fifty acres, more or less ; also the Sweatland farm, so called, in said Haverhill, being all the 100 acre lot No. eleven, west of the road through the same, in the first division of 100 acre lots in said Haverhill."

The second mortgage conveyed "all the farm in said Haverhill, lying on both sides of the Ladd street, so called, which I now live on, estimated at one hundred and fifty acres, more or less." Also the Sweatland farm, so called, in said Haverhill, being all the one hundred acre lot numbered eleven, west of the road through the same, in the first division of lots in said Haverhill, being the same land described in my mortgage deed to said Bell, dated February 28, 1842, and recorded in Grafton Registry, lib. 168, fol. 136."

The plaintiffs introduced a plan exhibiting the land in controversy. It included,

1st. The land called the Ward land,

| | | |
|---|---|---|
| Interval or meadow, | 16 acres | 100 rods, |
| Upland, | 15 " | 30 " |
| In all, | 31 " | 130 " |

2d. The land called the Ladd farm, lying alongside the Ward land, and on the north of it, including,

| | | |
|---|---|---|
| Meadow, | 32 acres | 100 rods, |
| Upland, | 42 " | 60 " |
| In all, | 75 " | |

In all 106 acres 130 rods.

Of the last tract 3 3-4 acres belonged to Mrs. Farnum, and 1 acre to A. Ladd, together 4 3-4 acres, and leaving of the Ladd and Ward lands together about 102 acres.   Ward, the former owner of the Ward farm, conveyed it to Joshua Woodward, November 4, 1833, for the consideration of $2050, by this description : ."The following described farm, situated in Haverhill, bounded west by Connecticut river, north by the Samuel Ladd estate, east by the new road leading from the old south meeting house to Nehemiah Wood's dwelling house, and south by Ezekiel Ladd's home farm, with the buildings thereon, estimated at fifty acres, be the same more or less." "Also about nine acres of land, out of hundred acre lot No. 19, south within range in said Haverhill, and is the same that Ezekiel Ladd sold to Moody Ladd, for description of which see said Ezekiel's deed to said Moody, recorded lib. 91, fol. 2, Grafton Records."

Samuel Ladd conveyed to Joshua Woodward, Nov. 23, 1840, for $2550, "all the farm in Haverhill, on which I now live, and being all and the same farm, on which my father Samuel Ladd lived at the time of his decease, except three acres and three quarters of an acre, set off to Cynthia A. Farnum, as part of her portion of her father's estate, and also excepting a small piece of land, on which Jonathan A. Ladd now lives, as described in his mother, Cynthia Ladd's deed to him." .

· January 2, 1839, Ezekiel Ladd conveyed to Joshua Woodward for $500, "the south half of 100 acre lot No. 19, within ranges in Haverhill, except 8 acres I have previously deeded to Moody Ladd ; bounded north by land of Joshua Woodward, Timothy Rix and Jonathan Bliss, west by land of Benjamin Swan, south by land now occupied by Elizabeth and Jesse Woodward, east by land of said Joshua Woodward."

December 27, 1836, Johnston Burbank conveyed to Joshua Woodward for $350, "land in Haverhill beginning at the north-east corner of the 19th hundred acre lot within the ranges, running south on the east line of the lot about 90 rods to land of Ezekiel Ladd, then west on the north line of Ladd land far enough to include 30 acres, by a line parallel with the east line of the lot to the north line of the same."

These two tracts, with the second tract conveyed in Ward's deed to Joshua Woodward, are in one body, and contain together 81 1-4 acres, as the defendant's evidence tended to show ; but the plaintiffs, upon the evidence of the deeds and plans, contended that the true contents were much less; the nearest part of which is about 51 rods from the Ward farm, measured upon the "new road" mentioned in Ward's deed to Joshua Woodward, and about the same distance from Ladd street.  Adjoining to these tracts, and between them and the road, was a tract of 8 acres, claimed to be the property of Joshua Woodward, and to be occupied by him, but no evidence of title was offered, except some testimony that it was occupied by him as pasture land.   It appeared that on the 23d day of November, 1840, the same day on which Samuel Ladd conveyed to Joshua Woodward the Ladd farm, said Woodward conveyed the same to Phillip Goss and Martha Goss, his wife, to be held in her right, by the following description : "All the farm in said Haverhill, which Samuel Ladd has by his deed of this date conveyed to

me, and being all the same farm, on which Samuel Ladd, the father of
said Martha Goss, lived at the time of his decease," with the same ex-
ceptions, as in Samuel Ladd's deed to Joshua Woodward, to secure the
payment of said Joshua's note to Mrs. Goss, dated Nov. 1, 1840, for
six hundred dollars in one year. Recorded Nov. 24, 1840. And on
the same day he conveyed to Joseph Bell the same land by the descrip-
tion of "all the farm in said Haverhill, which I have this day purchased
of Samuel Ladd, by his deed of this date, and being all and the same
farm in said Haverhill, on which Samuel Ladd, the father of the said
Samuel Ladd, lived at his decease," with the same exceptions; to secure
the payment of his promissory note to said Bell, dated of the same date,
for $1750, on demand with interest annually." Recorded Nov. 24,
1840, and discharged June 7, 1843.

Evidence was introduced by the plaintiffs, tending to show, that be-
fore and at the times of the conveyances here in question, there was a
house and buildings on Ladd street, upon the Ward estate in which
Joshua Woodward lived with his family; that James Woodward was
his son, born June 21, 1818, then unmarried and then, before and af-
terwards, making his home in his father's family; that there was a house
and buildings upon the same street upon the Ladd estate.

Evidence was introduced by the plaintiffs, tending to show that, at the
time of the execution of the deeds in controversy, Joshua Woodward
lived in the house on the Ward land, and carried on the Ward land and
the Ladd farm together, as one farm, Joshua Woodward and his sons
James and Henry working together, and there being no dividing fence
between the Ward and Ladd meadows, west of Ladd street.

The evidence for the defendants tended to show that the Ladd farm
was carried on by James Woodward alone, and not in any degree by
Joshua Woodward; that he rented the buildings and placed the crops,
which were gathered on that farm, in the buildings standing on it, and
disposed of them for his own use.

The defendant's evidence tended to show that at the time of both the
mortgages in question Joshua Woodward occupied and alone carried on
the Ward farm, and that said farm consisted of about 123 acres. Also
that the fences upon the low part of the meadows could not be kept up
by reason of freshets.

To the testimony and evidence offered for this purpose, many objec-
tions were made, and exceptions reserved by the defendants.

*Deposition of Matilda Whipple.* Int. 4. Did you ever hear your
husband say, while you lived in said house, (the Ladd house,) whether
he was there as owner of the house, or as tenant of some other person,
and if as tenant of any one, of whom? (Objected to as hearsay.)

*Ans.* He was at work for James Woodward at the time, and lived in
said Woodward's house. He said so.

*Int.* 5. Please state what you heard your husband say, while living
in said house, as near as you can recollect, in relation to his occupancy
under James Woodward. (Objected to.)

*Ans.* I have heard him often say that it was James Woodward's
house, and that he was at work for him. This was in 1842.

*Int.* 6. Do you recollect that any one applied to your husband at any time for permission to occupy a part of his share of said house, and if so, who was it? when was it? and what did your husband say? and where was it? (Objected to as hearsay.)

*Ans.* His brother wanted to come in there in the winter of 1842, and he said to me, that he did not know as James would be willing, and he should have to see him, and see what he said about it. This was in the Ladd house where we lived.

*Int.* 7. Please state if you know, what your husband paid for the use of said house, and to whom he paid it and how?

*Ans.* He paid twenty-five dollars a year to James Woodward, and used to work for him.

*Int.* 9. Please state whether said Isaiah worked for said James during all the eight years he lived in said house?

*Ans.* He did, most of the time.

*Int.* 10. Please state what you know about James Woodward being there on the Ladd place in said years, and what he was doing there.

*Ans.* I know that he was carrying on a farm there, and he used to be at our house, and give my husband directions about his work, as often as once a day, or every other day. He used to come in evenings, and give directions about the work for the next day.

*Int.* 12. Please state whether, during those years, and in which of them, you heard said Joshua Woodward say to whom the said Ladd farm belonged? and, if so, to whom did he say it belonged? and where was he when he said it? (Objected to.)

*Ans.* I don't know what years he said it, but I have often heard him speak of James' place. It was while we lived there. He was at our house—at James' house, on the Ladd farm.

*Int.* 13. What place did he speak of as James' place?

*Ans.* That place where he lived—the Ladd farm, so called.

*Int.* 14. Can you state whether this was before or after June, 1843?

*Ans.* I cannot.

*Benjamin Warren's deposition:*

*Int.* 26. State whether, at that time, you had understood from Joshua Woodward, whose the Ladd farm was? (Objected to.)

*Ans.* Mr. Joshua Woodward told me, it belonged to James; that he had nothing more to do with it than I had. He told me this sometime when we were at dinner, soon after I moved up there, before the work was done.

[He had previously said he commenced living there April 4, 1842.]

*Enoch Wiggin's deposition:*

[In answer to int. 6th, he says he occupied half of the Ladd house after 1840, and hired it of James Woodward.]

*Int.* 7. Did you apply to any one else for it? and if so, to whom did you so apply?

*Ans.* I applied to Mr. Joshua Woodward.

*Int.* 8. What did he say about it when you so applied to him? (Objected to.)

*Ans.* He said he had nothing to do about it. He did not own it. It belonged to his son, James.

*Int.* 15. Please state whether you heard said James, while on said Ladd farm, state to whom said farm belonged? If so, to whom did he say it belonged? (Objected to.)

*Ans.* I have heard him say that it belonged to him; that he owned it.

*Int.* 16. How soon, after you moved into said house—about how soon—did you hear said James so say?

*Ans.* I could not tell. I think it was in the course of the summer though.

*Int.* 17. Can you state where said James was, when he so told you, and whether it was on said Ladd farm or not, and what was he doing?'

*Ans.* I couldn't say, but it strikes me he and I were getting in some hay, and he told me he bought it, and was speaking about the payments; and when I hired the place, I think I met him and asked him if he was the man that owned the place, and he told me he was. (Answer objected to.)

*Deposition of Joshua B. F. Woodward:*

*Int.* 50. (Int. 49, was: Please state whether, after Nov. 1, 1840, and prior to 1845, you heard said James say anything about the ownership of the Ladd farm, and if so, where was it, and when, and what, as near as you remember?)

Please answer the last question, substituting therein the name of Joshua Woodward for that of James Woodward. (Objected to.)

*Ans.* Joshua Woodward told me that he bargained for the Ladd farm. I think this was in the fall of 1849, but it was just as I was turning up the lane from the road to the Ward house, where he lived. It was right at the pump, and just as I drove up he said: "I have bargained for the Ladd farm;" and I said, how much do you agree to pay? and I think he told me he was to pay $2600. I think that was the sum. That is all I recollect of his saying at that time. About noon, after I came from the Corner, I returned, and we had a conversation, and he told me he had bought the Ladd farm for James. I don't recollect of his saying anything to me about the ownership of the farm afterwards.

*Deposition of Eliza Poole:*

*Int.* 11. Please state whether or not you ever heard any one speak of said farm, (the Ladd farm,) as a part of Joshua Woodward's farm, or as the Joshua Woodward farm, and if so, when and to whom?

(Question objected to, and because it is leading.)

*Ans.* No, I never did.

*Int.* 12. As whose farm was it commonly spoken of after said Ladd's death? (Question objected to.)

*Ans.* As James Woodward's farm.

*Int.* 14. Please state whether, within two or three years after said Ladd's death, you heard James Woodward or Joshua Woodward say anything as to the ownership of said Ladd farm, and if so, what was said? [Question objected to by the plaintiff.]

*Ans.* I heard them say that James owned the farm, and was trying to pay for it. It was understood that James owned it. Joshua did not claim it, and took no interest in it, or in carrying it on.

The preceding interrogatories and answers, being objected to by the plaintiffs, were held inadmissible, and the defendant excepted.

The deposition of Joshua Woodward, now deceased, taken before two justices of the peace and of the quorum, in perpetual remembrance, and recorded, was offered on the part of the defendant.

An agreement, in writing, relating to the same, was offered, as follows:

GRAFTON, ss.              ⎫ JOSEPH M. BELL & ALS., ADM'RS,
Supreme Judicial Court in equity, ⎬        *v*
     Nov. 15, 1861,       ⎭ JOSHUA A. WOODWARD & ALS.

The defendant, James Woodward, proposing to take the deposition of Joshua Woodward, to be used in this cause, the plaintiffs object, that he is not a competent witness, because he is a party to the cause and interested therein, and that the plaintiffs bring this suit as administrators of Joseph Bell, deceased, and have not, themselves, testified therein. And thereupon it is agreed, that if it shall be holden by the court, that said Joshua may properly be examined by the defendants, or either of them, as a witness in this cause, his deposition taken in perpetual remembrance, on the 13th day of December, A. D. 1859, before N. W. Westgate and John McClary, Esquires, may be read, as if taken this day, subsequent to the deed and release annexed to the deposition of J. B. F. Woodward. But if said deposition is so read, the plaintiffs reserve the right to object to the competency and admissibility of any and all the questions and answers therein contained, both to the direct examination, and to the cross examination, then conducted in behalf of Mrs. Catherine Bell, but not to the form of the questions.

But this agreement is made for the purposes of the hearing in this suit only, and shall not be applicable to any other transaction, or proceeding between these parties, or any of them. And said deposition shall have the same use and effect as if taken in this cause and no other.

ALBERT R. HATCH, *For plaintiff*,
N. B. FELTON, *For deft. James Woodward*.

By the release referred to in this agreement, dated Nov. 15, 1861, James Woodward releases, &c., to Joshua Woodward, his heirs, &c., "all covenants in all deeds, heretofore executed by said Joshua to me, or to any other person, in which I am in any way interested."

And by the deed of quitclaim referred to, in the same agreement, dated Nov. 12, 1861, Joshua Woodward released, &c., to James Woodward, his heirs, &c., "all the lands and real estate, described and conveyed by me in fee and in mortgage to Joseph Bell, by deed dated the 28th day of February, A. D. 1842, and recorded in the registry of deeds for said county of Grafton, lib. 168, fol. 136."

The minute of the order made at the law term for a trial by jury, was as follows :

"Issue to trial term, to be tried upon evidence as now taken, but if either party prefers putting a witness upon the stand, he may do so at his own expense."

It was objected that no party to a suit in equity can be examined as a witness, without leave of the court previously obtained, to which it was replied that the objection was made too late at the hearing.

Upon the question of the admissibility of this deposition, the plaintiffs called the attention of the court to the deed of Joshua Woodward to James Woodward, dated June 9, 1843, the description of which may be referred to upon the argument.

The deposition was not admitted, and the defendant excepted.

The defendant offered, in evidence, his own deed of the premises in controversy, to Mary Hale, in mortgage, dated June 9, 1843, and a deed of Joshua Woodward to James Woodward of the Ladd farm, dated June 9, 1843. These deeds were recorded immediately after their dates.

To these deeds it was objected, that they were transactions between other parties, and it was not shown that they were known to Mr. Bell, at the date of his second mortgage.

They were not admitted, and the defendant excepted.

*Deposition of Phineas Spaulding:*

[He testified that a note shown him was once his property, a nd he bought it of Philip Goss, husband of Martha Goss, in December, 1844, or January, 1845.]

*Int.* 3. Was the whole note due and interest, except the indorsement of interest, which appears upon the note?

*Ans.* It was.

*Int.* 4. How long did you keep the note, and to whom did you sell it?

*Ans.* I kept it until James Woodward deeded to Miss Hale, and her agent then paid me the money for it, and took it.

*Int.* 5. In whose handwriting are the two last indorsements, and who paid the money?

*Ans.* They are in my own handwriting, and James Woodward paid the money.

These interrogatories and answers were objected to and held immaterial to the issue, and the defendant excepted.

Benjamin Swan, one of the plaintiffs' witnesses, testified, on cross examination, that he hired the part of the Ladd house in which he lived in 1842, of James Woodward. He had nothing to do with Joshua in regard to it. His impression was that the Samuel Ladd farm was carried on by James Woodward in 1842. Joshua Woodward was on the Ward farm when he (Swan) moved on to the Ladd farm in April, 1842. I presume he (Joshua) was there before that, but can't say how many years. I expect Joshua carried on the Ward farm when I moved there. I expect it was Joshua who carried on the Ward farm in 1842 ; don't know anything otherwise.

Defendant offered the testimony of Eliza Poole in answer to the 18th interrogatory in her deposition, that James Woodward carried on the Ladd farm after Ladd's death, which was in March, 1841. Also the testimony of Rebecca Hunt, to the same effect. The counsel for both parties insisted each that the other had offered no sufficient evidence to justify a verdict.

For the purpose of obtaining a decision of the whole court upon the admissibility of the evidence offered and not admitted, the court, by the assent of the counsel, directed a verdict for the plaintiff, which the defendant moves may be set aside by reason of the said exceptions.

The questions of law arising on the case, are reserved for decision at the Law Term; and the counsel, on the argument, are at liberty to refer to any of the papers used and offered on the trial.

*Hatch*, for plaintiffs.

I. The plaintiff claims to foreclose two mortgages made to him by Joshua Woodward, one of the defendants, one dated February 28, 1842, and the other September 4, 1844. The only question between the parties is, whether the description "*all* the farm, in said Haverhill, lying on both sides of Ladd street on which I now live, and which I now carry on, estimated at 150 acres more or less," includes the land claimed in the bill?

It is not in dispute, that, at the date of the mortgages, Joshua Woodward, by virtue of a deed from Ward dated in 1833, owned a tract of land in Haverhill, lying on both sides of Ladd street, actually measuring 31 acres, but estimated in Ward's deed at 50 acres; and, by virtue of a deed from Samuel Ladd, dated in 1840, he owned another tract of land in Haverhill, lying on both sides of Ladd street, side by side with the Ward lot, and not separated from it by any fence, containing by measure 75 acres, less two small tracts belonging to Mrs. Farnum and to A. Ladd, amounting in all to four and three fourths acres; that Joshua Woodward lived in a house on the Ward lot, and that James lived with him. But the defendants say that Joshua Woodward did not "carry on" the Ladd part of the farm at the date of the mortgages, but that his son James did so. The description in the second mortgage omits the words "which I now carry on," but refers to the land as the same described in the former mortgage. There is no other land which answers the description in the mortgage deeds; but the defendants say that Joshua Woodward, at the date of the mortgages, owned about 81 acres of land upon another road in Haverhill, the nearest part of which is 51 rods from the land first named (Ward land) and as far across the fields from Ladd street, and that this land with the Ward lot is to be taken to be the land included in the mortgages.

Now, upon these admissions of the defendants, the plaintiffs say that the issue sent to the jury is immaterial, and that the plaintiffs are entitled to judgment.

It is an elementary principle that a deed is to be construed most strongly against the grantor; *Canning* v. *Pinkham*, 1 N. H. 353,

*Bullen* v. *Runnels*, 2 N. H. 258, *Jackson* v. *Blodgett*, 16 Whar. 172 ; and that partial errors of description do not affect the conveyance if enough is left to show clearly what was intended to be granted.

The purpose of an issue in chancery is merely to inform the mind of the court. It is in the nature of evidence, and the decree may be in direct opposition to the verdict. *Tappan* v. *Evans*, 11 N. H. 334 ; *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 37.

In the present case, the proceedings of the trial, as reported by the late Chief Justice, give the court all the aid and information that a verdict could have given. The trial was wholly upon depositions already taken and in possession of the court. We ask the court, therefore, to look into the testimony and examine the plans, and to render judgment upon the whole case irrespective of any possible finding of a jury one way or the other. In other words we ask the court to confirm the action of Chief Justice Bell in directing a verdict for the plaintiffs.

The facts to which the description in a deed applies being ascertained, it is for the court to make application of them, and interpret and give them effect, as a matter of law.

In the present case, the following elements in the description agree with the plaintiffs' claim :

1. The land at the date of the mortgages was Joshua Woodward's.

2. It lay altogether as one "*farm*" not separated by fences.

3. It was all in "Haverhill."

4. It lay on "Ladd street," and on "both sides" of that street.

5. Joshua Woodward "lived" on it.

6. The Ward land, though measuring but thirty-two acres, was estimated in Ward's deed to Woodward at 50 acres ; the Ladd land was actually a little more than double the quantity of the Ward land, i. e., 75 acres ; add to the Ladd land in estimating it, the same proportion that made up the estimation of the Ward land, and 150 acres would naturally be arrived at as the fair estimate of the two lots. The quantity named in the deed renders it certain that something more than the Ward land was intended to be included in the deed. See *Bell* v. *Sawyer*, 32 N. H. 80. There can be no pretence that the lands which lay on the other road, distant more than 50 rods from the Ward land at the nearest parts was included in the mortgages. None of the elements of the description in the deed apply to it, except the fact that it was in Haverhill. So was the Sweatland farm, which would be included in the mortgage by any rule which would cover these lands. *Doe* v. *Bowen*, 313 B. & Ald. 453 ; *Allen* v. *Richards*, 5 Pick. 512.

The plaintiffs annex a plan of the premises copied from one proved in the cause, and pray that the case may be so amended as to include

it.   Moreover the quantity is still not made up more nearly, to any material extent, than upon our construction of the deed :

|  |  |
|---|---|
| Thus Ward lot, | 31 a.,   130 rods. |
| Ezekiel Ladd land, half of a 100 acre lot, | 50 |
| Burbank land, | 30 |
|  | 111 acres, 130 rods. |
| And if we add the 8 acre lot | 8 |
| we do not quite reach | 120 acres, |
| while the S. Ladd and Ward lots are by measure, | 117 " nearly. |

The above six items include the whole description in the mortgage of 1844, and certainly all but the words "which I now carry on," in the mortgage of 1842.   If we admit, then, that Joshua Woodward did not personally carry on the Ladd land in 1842, (which is in dispute) still this item of description is to be rejected, and the plaintiffs take the land by the remaining terms of the description.   The words "which I now carry on" are not to be construed as a limitation, because they are vague in their meaning, and because such a construction would be favorable to the grantor instead of the grantee.   See *Kimball* v. *Schoff*, 40 N. H. 190, where it was held that a description by the number of the lot "being the same farm on which said K. now lives," includes and is land which belonged to the lot, but which was not occupied by K. ; *Drew* v. *Drew*, 28 N. H. 489, where a devise of "all my homestead farm in Dover, being the same whereon I now live, and the same that was devised to me by my father" was held to include all the homestead, though part was not devised by the father.   *Tenny* v. *Beard*, 5 N. H. 58, *Cocheco Co*. v. *Whittier*, 10 N. H. 311–12 ; *Peaslee* v. *Gee*, 19 N. H. 277 ; *Clough* v. *Bowman*, 15 N. H. 513 ; *Winchester* v. *Kees*, 35 N. H. 43.   Repugnancies in a deed are to be rejected. *Emerson* v. *White*, 29 N. H. 482, 500 ; *Harvey* v. *Mitchell*, 31 N. H. 575 ; *Johnson* v. *Simpson*, 36 N. H. 91 ; *Doe & Norton* v. *Webster*, 12 Ad. & E. 442 ; *Wilkinson* v. *Martin*, 2 Tyr. 544 ; 2 C. & J. 636 ; *Lambe* v. *Reaston*, 5 Taunton 207 ; *Doe & Smith* v. *Galloway*, 5 Barn. & Adol. 43 ; *Hathaway* v. *Power*, 6 Hill 453 ; *Cro. Car.* 447, 473 ; *Lodge's Lessee* v. *Lee*, 6 Cranch 237 ; *Nutting* v. *Herbert*, 35 N. H. 126.   The circumstance that the whole of the land claimed by plaintiffs lay together not separated by any fence is material. *Davis* v. *Handy*, 37 N. H. 71.

It is to be observed, also, that the first mortgage which contains the words "which I now carry on," bears date Feb. 28th, at a time of the year when land can hardly be said to be carried on at all.

The authorities agree that, in construing a deed, effect is to be given to all its parts if possible.   This cannot be done by giving to the words above cited the effect of a limitation, because they would then be inconsistent with other parts of the description.   But if construed to mean merely that the land "which I now carry on" is included in the conveyance, effect is given to the whole instrument.   Much stress is laid upon

the word "all" in several of the cases above cited, and that word must be understood to apply to each of the several items of the description cumulatively.

II. The plaintiffs regard the evidence offered by defendants as immaterial, and the consideration of the exceptions which grow out of it unnecessary. But in any view the testimony of Matilda Whipple, B. Warren, E. Wiggin, J. B. F. Woodward, and E. Poole, ruled out by the court, was properly excluded. It consists :

1. Of declarations of parties and third persons, which are merely hearsay; and,

2. Of an attempt to prove title in James Woodward by parol, and in contradiction of the deeds.

None of them have any tendency to settle the issue, which is simply whether certain lands were included in the description in the mortgage deeds.

It does not even tend to show whether Joshua Woodward "carried on" the Ladd land.

Similar objections apply to the deed of Joshua Woodward to James, and to the testimony of Spaulding. They are *res inter alios*, and subsequent to the first mortgage to Mr. Bell.

The cases which relate to the declarations of a tenant against his interest or qualifying his claim, or defining his occupation, are not applicable. The issue does not present the question whether Joshua Woodward owned the Ladd land, but simply whether it is included in the deeds to Mr. Bell. If the question were presented whether Joshua Woodward owned the land, neither his declarations nor those of other persons could be admitted to contradict the deed of Samuel Ladd to him. And if the mortgages actually include this land, evidence of the intention of Joshua Woodward to except it cannot be received. *Nutting* v. *Herbert*, 35 N. H. 126.

It would be a fraud in law and in fact for defendants to set up an equitable title in James Woodward, of which Mr. Bell had no notice, to defeat the title which, upon the record, Joshua Woodward was authorized to give, and which his mortgage deeds actually do give.

The plaintiffs apprehend that none of the cases cited by defendants go to the extent of allowing a defendant to show his own declarations or those of persons claiming under him to defeat or in any way modify the legal effect of a deed.

III. The plaintiffs being administrators, and not having testified themselves, the deposition of Joshua Woodward was not admissible. He was not a nominal but a real party. He made the mortgages, and is estopped to deny his title.

The deeds and releases between him and James Woodward do not extinguish his interest in the suit. The release and quitclaim bear date subsequent to the commencement of the suit which was instituted in 1859, (see record.) And the deed of June 9th, 1843, reserves to Joshua Woodward of the land he mortgaged to Mr. Bell "a small piece

of land formerly occupied as part of a garden," and "the right to pass across the meadow." (See that deed.)

From his interest Joshua Woodward could not be examined at all; but if he were a nominal party only, he could not, even before our statutes, be examined as a witness without a special order of the court. *Second Cong. Soc. in Hopkinton* v. *First Cong. Soc. in Hopkinton*, 14 N. H. 325, which definitely settles the practice.

But it is said that plaintiffs have waived the objection. How? They certainly objected that he was not entitled to testify, and agreed only that his deposition taken *in perpetuam* might be substituted for any that could lawfully have been taken on the 15th of November, 1861. The objection, like the objection for interest, &c., might well be taken at the hearing, and plaintiffs were not bound to make it when the deposition was taken, or substituted for one that might have been taken.

There was manifestly no intention on the part of the plaintiffs by the agreement to waive any objection, and they were not at the time in a position which required them to state any objection. The objection that the deponent was a party to the suit is distinctly taken in the agreement; it was incumbent on the defendants to suggest any fact which tended to obviate the objection.

*C. R. Morrison & Felton*, for defendants, among other things, contended, that no part of the Samuel Ladd farm, claimed in plaintiffs' bill, was intended to be conveyed by either of the mortgage deeds of Joshua Woodward to Joseph Bell, executed in 1842 and 1844.

1. Because the Ladd farm had previously been encumbered by an amount equal to its value to Mrs. Goss and Mrs. Bell, by deeds of mortgage delivered prior to 1842.

2. That Joshua Woodward in 1842 and '44, lived on and carried on the Ward farm, which then included, also, the Burbank and Ezekiel Ladd out-lands, and his son, the defendant, either by himself or tenant, carried on the Ladd farm, and it was not intended by the parties to the mortgages of 1842 and '44, to embrace only what was then known, used, and occupied, as the *Ward farm*. Defendant's counsel contended that, by a fair construction of the language of the deeds themselves, only the Ward farm and its appendages would be embraced in said mortgage deeds. These positions were maintained by various arguments, and the following authorities were cited and commented on: *Wood* v. *Jones*, 7 B. 474; U. S. Dig. 1848, p. 98; *Doe* v. *Bowen*, 3 Barn. & Ald. 453; *Allen* v. *Richards*, 5 Pick. 512; *Drew* v. *Drew*, 28 N. H. 500; *Jackson* v. *Morgan*, 13 Johnson 531; *Tyler* v. *Mixter*, 11 Pick. 347; *Aldrich* v. *Gaskill*, 10 Cush. 155.

To show the origin and meaning of the word *farm*, defendants' counsel cited 1 Roberts on Wills, 396; 1 Jarman on Wills, 621; 1 Coke's Ins. 5 A. 7; Cruise Digest, Title Deed, chap. 20, sec. 41; Bouvier Law Dic. word *Farm*. They contended that the following elements,

or particulars in the mortgage deeds, upon the evidence before the court, coincided with the defendant's claim:

1. The land at the date of both deeds was Joshua Woodward's.
2. It was in Haverhill.
3. It lay upon both sides of Ladd street.
4. It was occupied as one farm, had the characteristics of one farm, and none of the qualities of separate farms.
5. Joshua Woodward *lived* on it.
6. At the date of the last mortgage, it was all *carried on* by him.
7. The Ward farm was called *50 acres* instead of *32 acres*, which would bring the estimated quantity to *140 acres*, and, allowing but a slight difference for the 50 acres bought of Ezekiel Ladd, the whole estimated quantity is had.
8. In any court, this estimation gives 20 acres nearer the estimated quantity in the deeds, than the plaintiffs give, unless both the 90 acres and the Samuel Ladd farm be included, in which case the acual quantity is 40 acres in excess, and calling the Ward place 50 acres instead of 32 acres would make about 60 acres in excess.
9. If the Ladd farm be not included, then there was nothing but the Ward farm for Joshua Woodward to carry on under his second mortgage in 1844.
10. None of this land was under any previous mortgage to Joseph Bell, and there is nothing in the deeds to indicate that the lands therein described, whatever they might be, were included in any prior mortgage to Mr. Bell.

Therefore, the defendant contends, upon the assumption that the 90 acres of outlands made a part of the Ward farm, that it thus met the description in the deeds in every particular, except as to quantity, and was all Joshua Woodward had to convey, at the date of his second mortgage. Also, that the Samuel Ladd farm, at the date of the said first mortgage, was valueless as a security, being then encumbered for its full value. The Goss mortgage and the other mortgage to Mr. Bell, being then both equal in amount to $2530, and within $20 of the amount stated in the deed, Ladd to Woodward.

Again, defendant contended that when the said first mortgage was executed to Mr. Bell, in 1842, he, or his tenants, was in the open possession of the Ladd farm, of which fact Mr. Bell had full notice, and that Joshua Woodward did not in any way and to any extent then *live on* or *carry on* said Ladd farm. These words here used are as strong, as the word *occupy*, and an occupation by a tenant would not be deemed the occupation of the several owners for the purposes of description in a *deed* or *will.* *Jackson* v. *Sill*, 11 Johns. 202; *Brown* v. *Salstonstall*, 3 Met. 426; *Warren* v. *Cogswell*, 10 Gray 76. Hence, this part of the description in the mortgage deeds could not be made to apply to the Ladd *farm.* Defendant's counsel contended that the court, in giving their construction to said deeds, should not reject any part of the description in the deeds, and that the doctrine contended for by

plaintiff as contained in *Kimball* v. *Schoff*, and *Drew* v. *Drew*, &c., did not apply to this case, and on this point referred the court to *Barnard* v. *Martin*, 5 N. H. 536; *Woodman* v. *Lane*, 7 N. H. 243; *Doe* v. *Perkins*, 5 Taunton 321; *Gascoigne* v. *Barker*, 3 Atkyns 8; *Morrill* v. *Fisher*, 4 Exc'r. 591; *Wilson* v. *Mount*, 3 Vesey 191; Bacon's Maxims, 13.

As to the manner in which the Ward farm had been occupied, and what lands or parcels constituted it, as heretofore enjoyed, if the bonds of the deed were doubtful or ambiguous, such doubt must be removed by resort to parol, extrinsic evidence, and the verdict must be set aside to enable the jury to settle this fact.

As to the competency of the evidence relative to the acts and declarations of Joshua Woodward while in possession of his lands, defendant's counsel cited 1 Greenleaf's Evid. sec. 109, 189; *Little* v. *Gibson*, 44 N. H. 505; *Fellows* v. *Fellows*, 37 N. H. 85; *Blake* v. *White*, 13 N. H. 273; *Bradley* v. *Shepard*, 23 N. H. 444.

As to the *acts* and *declarations* of the defendant, while in possession of the Ladd farm, being offered not to contradict the deeds, but to explain and limit his possession, the counsel cited 1 Greenleaf Ev. sec. 109; *Fellows* v. *Fellows*, *ante*; *Hodgdon* v. *Shannon*, 44 N. H. 572; *Lyman* v. *Downs*, 3 N. H. 436; *Sessions* v. *Little*, 9 N. H. 271; *Hadley* v. *Carter*, 8 N. H. 40; *Hanson* v. *Henderson*, 23 N. H. 498.

Defendant's counsel contended for the propriety of receiving, as testimony, sundry and distinct acts of ownership, both in Joshua and James Woodward, as evinced by their conveyances, by their reception of rents, crops, the purchase in of outstanding mortgages of Goss and Bell, and the like. That the rule, that deeds should be construed most strongly against the grantor should not be made to apply, until all other rules of construction fail. *Melvin* v. *Props. of Locks and Canals*, 5 .Met. 27; *Clough* v. *Bowman*, 15 N. H. 504.

The deposition of Joshua Woodward taken in perpetuam, before the filing of this bill, should be admitted. On this point they cited '" ' .ey's Equity, 338; 1 Greenleaf's Evid. sec. 361, 390 and 408;' .int v. *Stiles*, 10 N. H. 466; *Moore* v. *Green*, 13 N. H. 32; *Edgerly* v. *Emerson*, 23 N. H. 555; *State* v. *Flanders*, 38 N. H. 324; *Edwards* v. *Griffin*, 41 N. H. 529; Daniel's Chanc. Prac. 1146; 2 Johns. Chanc. 345; 1 P. Williams 414.

NESMITH, J.   The plaintiffs, as administrators upon the estate of the late Joseph Bell, late of Haverhill, deceased, claim to foreclose tw-'deeds of mortgage, purporting to be made by Joshua Woodward, deceased, to said Joseph Bell, in his lifetime; the first deed being dated Feb. 28, 1842, the second, Sept. 4, 1844.   The defendant, by his pleas, denied that said deeds of mortgage included the land, known as the Ladd farm, situate in Haverhill, &c., and moved that this question be tried by the jury; and the same was ordered by the court.   The issues, as made, were between plaintiffs as administrators on the one side,

and James Woodward alone; Joshua Woodward having previously died.

The case was tried at the late September Term, 1864, and, for the purpose of obtaining a decision of the whole court upon the admissibility of the evidence offered, and rejected, the court, with the assent of counsel, directed a verdict for plaintiffs, which the defendant now moves to set aside.

The material question is upon the construction of the description of the land, embraced in said deeds of mortgage. The first deed has the following language : "All the farm in said Haverhill, lying on both sides of Ladd street, on which I now live, and which I now carry on estimated at 150 acres more or less." The description in the second mortgage deed omits the words, "*and which I now carry on*," being, in other respects like the first, and designating the land "as the same described in my mortgage deed to said Bell, dated Feb. 28, 1842." The case finds that one Ward, as early as Nov. 4, 1833, had conveyed to Joshua Woodward his farm in Haverhill with the buildings thereon, estimated to contain 50 acres more or less, and by the same deed, also, about 9 acres of the 100 acre lot, No. 19, being the same that Ezekiel Ladd sold to Moody Ladd. That, in 1836 and '39, said Joshua purchased other parts of lot No. 19, of Johnson Burbank and Ezekiel Ladd, and that he had long possessed about 8 acres, adjoining one of the aforesaid tracts of land, being part of said lot No. 19, which he claimed to own, but offered no paper title to it. That, on the 23d of November, 1840, Samuel Ladd conveyed to Joshua Woodward, for the consideration of $2550, all his farm in Haverhill; being described as the one on which I now live, and all the same farm on which my father Samuel Ladd lived at the time of his decease, except two small reservations to Cynthia Farnum and Jonathan A. Ladd, amounting to about 4 3-4 acres. Deducting these reservations, the quantity of land by survey, as claimed by plaintiff, was 70 1-4 acres. By the case, it appeared, that, on the day of the purchase, this farm was reconveyed by mortgage by Joshua Woodward to Phillip Goss, and his wife Martha, to secure his promissory note to her dated Nov. 1, 1840, for six hundred dollars, payable in one year. And, on the same 23d day of November, 1840, said Joshua conveyed by mortgage the same premises to Joseph Bell, to secure his promissory note to Mr. Bell of the same date, for $1750, on demand, with interest annually; both of which deeds of mortgage were recorded Nov. 24, 1840, and the latter was marked discharged on the county records, June 7, 1843.

The plaintiffs claimed, under their bill, the aforesaid Ladd farm, embracing the aforesaid 70 1-4 acres of land, together with the Ward farm also lying south of it, and contiguous to it, including in intervale land 16 acres, 100 rods, and upland also, 15 acres, 30 rods, making in the whole, 31 acres, 130 rods, by actual survey; both of said farms constituting a little more than 102 acres of land. These lands, plaintiffs say, were the lands intended to be embraced in the description of the aforesaid mortgages to Mr. Bell.

On the other hand, the defendant contends that no part of the Sam-

uel Ladd farm was intended by the parties to be embraced in either of said mortgages; but, that said deeds were intended to embrace solely what was then known as the Ward farm; and that the Ward farm was made up not only of the aforesaid quantity of 31 acres and 130 rods, but also by the addition of about 90 acres of other outlands, which said Joshua had purchased, as before stated of Burbank, and Ezekiel Ladd, and from the piece held by virtue of his long continued possession. These several tracts combined made up a farm of about 123 acres. Although no part of these outlands were within 51 rods of the 31 acres and 130 rods tract, yet they had been used and enjoyed, as pasture and wood lands, by Joshua Woodward before the purchase of the Ladd farm, and, therefore, were known as part or parcel of the Ward farm.

Defendants alleged that these lands were not encumbered, when the first mortgage was made to Mr. Bell, in February, 1842, while the Ladd farm was then encumbered by previous existing mortgages to Mr. Goss and Mr. Bell to an amount equal to its value. The parties were in conflict, according to the evidence, whether Joshua Woodward carried on the Ladd farm, at the time of the first mortgage. It was not in dispute, that he lived on the Ward farm, and did carry that on at the date of the execution of both mortgages, while defendant insisted that his father, Joshua Woodward, never lived on the Ladd farm, and never carried it on. Evidence was offered, that, at the date of the first mortgage to Mr. Bell in 1842, one Wiggin did occupy part of the dwelling house on the Ladd farm, under a title from James Woodward.

In construing a description of property granted or devised in a deed or will, the facts of the case are to be first ascertained, that the *instrument* may be interpreted with reference to the actual facts which were before the grantor or devisor, because in this way their intention and meaning may thus be most readily and satisfactorily ascertained. The whole language of the deed is to be taken together, and effect, if possible, is to be given to every part. If, by any rational construction, the several parts can be made to harmonize and to consist with the obvious general intent of the maker, there can be no good reason for rejecting any part, or denying to it its legitimate effect. No word or clause is to be rejected or overlooked, if a reasonable and consistent construction can be given to them. *Drew* v. *Drew*, 28 N. H. 495; *Webster* v. *Atkinson*, 4 N. H. 23; *Jackson* v. *Moore*, 6 Cowen 706; *Hibbard* v. *Hurlburt*, 10 Vt. 178.

There is another elementary principle applicable to cases of this kind: That where the description of the estate intended to be conveyed includes several particulars, all of which are necessary to ascertain the estate to be conveyed, no estate will pass, except such as will agree with the several particulars of the description. *Hathaway* v. *Power*, 6 Hill 453; *Jackson* v. *Clark*, 7 Johns. 217; *Jackson* y. *Marsh*, 6 Cowen 281.

This principle has its modification and limitations; as when the description be sufficient to ascertain the estate intended to be conveyed, or the estate is described with sufficient certainty, although it do not agree with some of the particulars in the description, yet it is made to pass by

the conveyance.    This is under the rule, that *falsa demonstratio non nocet*, as in the instance of the conveyance of the farm called *A.*, now in the occupation of *B.*, here the farm is designated correctly as farm *A.*, but the demonstration would be false if *C.*, and not *B.*, was the the occupant, yet it would not vitiate the grant.    4 Kent's Com. 467; *Bosworth* v. *Sturtevant*, 2 Cush. 392; *Kimball* v. *Schoff*, 40 N. H. 190; *Drew* v. *Drew*, and cases cited there, *ante*.

Hence, under the aforesaid rule as modified, if the court, under all the proof of the case, should find that, at the time of the delivery of the mortgage deed by Joshua Woodward to Mr. Bell, in February, 1842, Joshua Woodward did not then carry on, the Ladd farm, then this part of the description in the deed might be rejected, but it would be wrong to reject this one particular in the description, if the meaning and obvious intent of the parties can be made by the same language to apply to the lands described in the bill, and in all other respects to consist and harmonize with the other parts of the deed.

Deeds are also to be construed with reference to the actual rightful state of the property at the time of their execution.    Or where the language employed is susceptible of more than one interpretation, the court will look at the surrounding circumstances, existing when the deed was made, the situation of the parties and the subject matter of the conveyance. *Dunklee* v. *The Wilton Railroad*, 24 N. H. 489; *The Win. Lake Comp.* v. *J. L. Perley*, reported in this volume; 2 Cow. 195; 13 Peters 89.

In this case, we have the main or leading description in the deed to consist in the words "all my farm in Haverhill;" then we have other additional cumulative descriptions, tending to illustrate the subject matter of the grant; but if the court cannot, by a fair and legitimate construction, or use of either description, or by all united, locate with sufficient certainty the land conveyed in the several deeds, then the court will resort to extrinsic or parol testimony, and to the aid of a jury, to ascertain the true intent of the parties, and to locate the lands.    Prof. Greenleaf says, where the language of a deed is doubtful in the description of the land conveyed, parol evidence of the practical interpretation by the *acts* of the *parties* is admissible to remove such doubt.    1 Greenleaf's Evidence, secs. 293 and 286, and notes.    In *Reed* v. *Props. of Locks and Canals*, 8 Howard 274, Judge Grier lays down the familiar doctrine, that, though it is the duty of the court to construe a deed, it is the duty of the jury to apply its terms, when thus construed, to the land, and ascertain whether the premises in question are within the description.

This case also falls under that class where the very general description adopted in the deed will apply to two distinct subjects, thus constituting what is well known as a latent ambiguity.    Hence, parol evidence becomes admissible to explain them.    The ambiguity arising from too great a generality of description may be removed by oral evidence, which restrains, confines and applies that description to a single object, although on the mere comparison of the terms with several objects, they may be equally applicable to more than one.    The application of a gen-

eral description of land in a deed to the subject matter intended to be conveyed, and the determination of the question, whether a particular tract of land is included therein or not, is a question of *fact* for the jury. *Jackson* v. *Moore*, 6 Cow. 722, and note, where the doctrine of parcels or different descriptions is well explained; *Pettingill* v. *Porter*, 3 Allen 349; 3 Starkie's Evidence, 1021; *Ryers* v. *Wheeler*, 22 Wend. 148; *Paddock* v. *Fradley*, 1 Crompton and Jervis (1 Exchequer) 90. This doctrine is well illustrated by Justice Bigelow, also in *Gerrish* v. *Towne*, 3 Gray 88.

Hence the parties to the deeds, or in interest, will be permitted to show, in aid of the interpretation of the instruments, the relative position of the lands, and their boundaries and condition, the mode of their use and their occupation, and that they had acquired a local designation or name, by which they were known or distinguished, or whether they were part or parcel of a particular estate. There is nothing in the legal definition of the word *farm*, as understood in the common and popular sense of the word, which countenances the idea that the parts or parcels, of which it is composed, must by necessity adjoin, or be adjacent to each other, or that a separation of one part of the farm from the rest by 51 rods, or even a greater distance, should form an insurmountable, or even a serious objection to its being considered one entire farm. The English definition of the word *farm* imports all such premises as have been *let together*. Roberts on Wills, vol. 1, p. 396. In its more general acceptance a "farm" means that which is held by a tenant. 1 Jarman on Wills, 621. Coke gives the derivation of this Saxon term. 1 Coke's Institutes, 5 A. The word *farm* comprehends many things; for, by the conveyance of a *farm*, will pass a messuage, arable land, meadow, woodland, &c., thereto belonging, or therewith used. Because the word properly signifies a messuage, with a quantity of demesnes thereto belonging. Cruise Digest Title, Deed, chap. 20, sec. 41; Bouvier Law Dic. Art. Farm.

The American definition of the word corresponds with the English, and, in cases of doubt, it is entirely consistent with our practice to explain by parol evidence what a particular farm was commonly reputed to include, or rather what belonged to, or was used with it, and what was parcel thereof, or what was known as a house, mill, mill spot, yard, or a factory, *eo nomine*. 1 Greenleaf's Evid. secs. 286, 287; *Woods* v. *Sawin*, 4 Gray 322; *Drew* v. *Drew*, ante.; *Old Col. Railroad* v. *Evans*, 6 Gray 25; *Moore* v. *Meacham*, 6 Selden 207; *Clough* v. *Bowman*, 15 N. H. 504; *Fish* v. *Hubbard*, 21 Wend. 651, and various authorities quoted by defendants' counsel.

Hence, whether the outlands, being 80 or 90 acres more or less, the nearest part of which was at least 51 rods from the 31 acres and 130 rods, upon which the Ward buildings stood, were in fact parcel of what was called the Ward farm, at the date of the execution of the two mortgage deeds to Mr. Bell by Joshua Woodward, can be shown here by extrinsic evidence, and by those who were then well acquainted with the premises, and we can thus be informed how they had been treated, and whether used as appurtenant to the Ward farm or not.

The defendant contends, that, at the time of the conveyances aforesaid in 1842 and '44, these aforesaid outlands were used by Joshua Woodward as pasture lands, where his cows and other animals were usually kept, and where more or less of his pine wood and timber was cut, and were thus necessarily occupied in connection with the improved homelands and buildings, and so made up a part of the Ward farm. The plaintiffs, on the other hand, contend that these outlands were too remote, situate on another road were used separately, and made no part of *any farm,* *eo nomine,* and that it would be repugnant to the deeds to infer that they belonged to the Ward farm.

Plaintiffs also allege, that the following elements in the description in the deeds in question agree with the plaintiffs' claim, as set out in their bill, embracing the original home farm of *Ward* and *Ladd,* and amounting, in quantity, to about 102 acres, viz. :

1. The land at the date of the mortgages was Joshua Woodward's.
2. It lay all together as one farm not separated by fences.
3. It was all in Haverhill.
4. It was situate on Ladd street and on both sides of that street.
5. Joshua Woodward lived on it.
6. The Ward farm, though measuring somewhat less than thirty-two acres, was estimated in Ward's deed to Woodward at 50 acres, the Ladd land being actually a little more than double the quantity of the Ward farm, when actual measure was regarded.

To meet the plaintiffs' construction of these deeds, and to show the probabilities on his side, and to show that the Ward farm with the outlands in fact made up the description in the deeds, or that this view best meets all the demands or calls of the description in said deeds, the defendant presents the following elements in support of his theory :

1. The land was all in Haverhill.
2. It was at the date of both mortgages owned by Joshua Woodward.
3. It was situate on both sides of Ladd street.
4. It was occupied as one farm, had all the characteristics of one farm, and none of the qualities of a separate farm.
5. Joshua Woodward lived on it.
6. At the date of the first mortgage it was all carried on by him.
7. The Ward farm was called 50 acres instead of 32 acres, which would bring the estimated quantity in the deeds to 140 acres, and, allowing but a slight difference or addition for the lot bought of Ezekiel Ladd, and the whole estimated quantity is had.
8. In any event, this estimation gives 20 acres nearer the estimated quantity than the other, (or plaintiffs',) unless all the 90 acres and the Samuel Ladd farm be included, in which case, the actual quantity would be 40 acres in excess of the 150 acres in the deeds, and, calling the Ward farm 50 acres instead of 32, would make an excess of about 60 acres.

Such are some of the facts and inferences of law arising out of them, presented by the counsel of the respective parties, giving their versions of the descriptions in the deeds in question. The difficulty is, that the several parties, according to their interests, aim to apply their facts and

reasoning to different lands, hence they are at variance, both in their premises and conclusions.

Upon the principles before suggested, the language of the deeds in question being doubtful as to lands intended to be conveyed, the court will resort to parol evidence to obtain the *practical interpretation* thereof, as determined by the *acts* of the parties themselves, in order to remove such doubts. And it is for the jury to determine upon the weight and application of this kind of evidence.

Where the deed or grant does not contain any *certain description*, but there is a description by *circumstances*, and all the *circumstances may* be essential to *distinguish* the lands intended to be granted, the law requires *all the circumstances* to be *proved*, and will not suffer any lands to pass except those that fall within the terms of the deed. *Vide* the aforesaid case of *Jackson* v. *Moore*, 6 Cow. 722, where this question is ably discussed.

Courts will call to their aid *acts* done under the deed, as a *clue* to the intention of the parties. *Frost* v. *Spalding*, 19 Pick. 445 ; 16 Johnson 22 ; 7 East. 199. So the acts of the party may be shown through whom title is claimed. *Jackson* v. *Ogden*, 4 Johnson 140. Prof. Greenleaf's rule is broad. No reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the claimant's title, or otherwise qualifying his possession, if made in good faith, should not be received as part of the *res gestae*, leaving its effect to be governed by other rules of evidence. 1 Greenleaf's Evidence, secs. 109, 189 ; *Fellows* v. *Fellows*, 37 N. H. 86 ; *Hodgdon* v. *Shannon*, 44 N. H. 575.

Under the aforesaid rule, evidence of the acts and declarations of Joshua and James Woodward, tending to show the character of their occupation, and especially when tending to show whether or not the premises were used and treated as part of the Ward farm, or Ladd farm, or otherwise, becomes competent, as part of the *res gestae*. So it is important to know how these farms were carried on, and how used. As the occupation upon the evidence was equivocal, evidence of the claims of James and Joshua becomes competent as tending to show the character of the acts of each, whether acts of occupancy for himself or the other. The acts and declarations of tenants of the like character are to the same extent competent. The declarations of a party in possession of lands, as to the nature of his possession, may be given in evidence against all persons claiming under him. *Jackson* v. *Bard*, 4 Johns. 230 ; *Jackson* v. *McCall*, 10 Johns. 377.

The testimony of Enoch Wiggin appears to us to be admissible and pertinent, that, as early as 1841, he hired half of the Ladd house of James Woodward, and paid him the rent of the same during his occupation, and also the testimony of others cognizant of these and like facts. The deed from Joshua Woodward to James, of June 9, 1843, appears to us to be admissible, as bearing directly on the second mortgage.

As a defense in this action, and as an answer to plaintiffs' claim, the defendant would have a right to show the actual title of the premises or

Ladd farm in himself, or to be in another person.  2 Greenleaf's Evi-
dence, sec. 331; *Parker* v.  *Prop. Locks, &c.,* 3 Met. 99.   Joshua
had at least an equity of redemption in the premises in himself at the
time of the conveyance to James.   Under the admission of the parties,
and the finding of the case, the Goss mortgage and the first mortgage
to Mr. Bell were then outstanding incumbrances upon the Ladd estate.
It was competent for James Woodward to fortify his own title, and to
show that he purchased in by his own means either of the aforesaid in-
cumbrances, and that he in this way has become subrogated to the orig-
inal legal rights of the mortgagees, by the assignment of the notes and
mortgages to himself, or to either of them, and to fortify the presump-
tion that the occupation was in the true owner.  The mortgage of the
Ladd place by James Woodward to Miss Hale, may properly be admit-
ted as evidence of an *act* of *ownership*, and may be weighed by the
jury, as might the act of paying taxes, or procuring the property to be
insured.   The testimony of Spalding, therefore, becomes pertinent on
this point.  *Hodgdon* v.  *Shannon, ante.*

Can the deposition of Joshua Woodward be used as evidence before
the jury?   This deposition was taken before this bill was filed.   It was
taken under our statute to preserve testimony, *in perpetuam memoriam
rei*, and with notice to the plaintiffs in interest, and with a cross exam-
ination of the deponent.   The deponent has since been made one of the
defendants in the present bill, and has since deceased.   It was, no
doubt, a correct practice to make the original mortgagor in a bill for a
foreclosure a party to the bill, or to bring in his representative after his
decease.   If the heir of the mortgagee brings a bill to foreclose, the ex-
ecutor, as well as heir of the mortgagor, must be made a party.   2
Maddox Chanc. 186; *Clarkson* v.  *Boyer,* 2 Vernon 66; 2 Equity
Abridg. 77; 1 Wash. on Real Actions, 505.   This practice exists where
such legal representatives have a present interest in the estate before the
court.   As death abates the suit, so far as such deceased party is con-
cerned, the rule is to summon in the representative of the deceased by a
bill of revivor.   *Wood* v.  *Leland,* 1 Met. 387.   If Joshua Wood-
ward be regarded by the plaintiffs as a mere nominal party, originally
placed as defendant without pecuniary interest in the estate claimed,
and if now, as against his representative, they do not seek a decree,
then his name should no longer stand on the record, and James Wood-
ward, his co-defendant, would be entitled to use his testimony.  1 Mad-
dox 183; *Plummer* v.  *May,* 1 Vesey 426.

But, assuming from the argument of plaintiffs that they still intend
to bring in the legal representative of Joshua Woodward, and make
him a party to these proceedings, we proceed to inquire into the charac-
ter of the alleged interest of Joshua Woodward in the lands embraced
in their bill at the time of filing the same.   He would seem to have in
himself the equity of redemption in the Ward farm, be the same of
more or less value.   It also appears, from the deed of Joshua to James
Woodward, made June 9, 1843, that James reserved to his father from
the land mortgaged to *Mr. Bell,* "a small piece of land formerly occu-
pied as part of a garden, and the right to pass across the meadow,"

meaning the Ladd meadow, as we suppose. It is apparent that these interests are not large in a pecuniary sense, still, if suffered to remain in Joshua's estate, they would, to the extent of their value, operate as a cloud upon the plaintiffs' title, provided they maintain their title to the premises in their bill. Hence, for the purpose of perfecting their title, and foreclosing all Joshua Woodward's rights in the estate now claimed by the plaintiffs, they had reasonable grounds for making him a party to the original bill, and to bring their bill of revivor against his legal representative.

If it appears at the time of the hearing of the cause, that the witness is an *interested* witness, the court will suppress the deposition. Maddox Chanc. 421, 24, and 414. The subsequent mutual releases executed, as the case finds, since the filing of this bill, cannot restore competency to the deposition, as the witness should have discharged his interest before he was sworn in the cause. The releases came too late. 2 Daniell's Chanc. Pr. 1043, and 4. And it is the opinion of the court, that, so long as there was an interest reserved in Joshua Woodward in the lands in question, he cannot testify.

Aside from these questions as to the evidence rejected, only a portion of which we have considered, as there was other testimony on which the jury might have found for the defendant, the verdict must be set aside, and there must be

*A new trial.*